Jackson WARREN, Appellant,

v.

**CITY OF LINCOLN, NEBRASKA;
James Breen; Sandra L. Myers
and David M. Beggs, Appellees.**

No. 86–1434.

United States Court of Appeals,
Eighth Circuit.

Submitted Oct. 17, 1986.

Decided April 17, 1987.

Dorothy Walker, Lincoln, Neb., for appellant.

Richard D. Sievers, Lincoln, Neb., for appellees.

Before HEANEY and WOLLMAN, Circuit Judges, and LARSON,* Senior District Judge.

HEANEY, Circuit Judge.

Jackson Warren, a Lincoln, Nebraska, college student, appeals from the district court's judgment dismissing the 42 U.S.C. § 1983 action he had filed against the City of Lincoln and three Lincoln police officers following an adverse jury verdict. For the reasons set forth below, we reverse and remand.

## I. BACKGROUND.

At 4:30 a.m. on April 13, 1985, several Lincoln City police officers were investigating an attempted burglary in southwest Lincoln. Officer Sandra Myers was on duty in that area when she heard Officer Alexander state, over the police radio, that his dog was tracking a suspect in the vicinity of 15th and C Streets. Myers decided to drive towards that intersection. As she did, she heard Officer Lafevre say that he was going to investigate a parked vehicle on 19th and C Street. She immediately went west on C Street to assist him. Myers and Lafevre arrived at the parked

car at about the same time. Jackson Warren was sitting in it.

As the officers converged upon the area, Warren attempted to leave. Officer Alexander and his police dog approached Warren and requested that he pull over, park his vehicle, and remain inside. The officer in charge directed Myers to question Warren.

Myers testified that she approached Warren in his car and asked him for identification, for vehicle ownership information, and for a detailed summary of his evening activities. Warren answered all questions.

After the initial questioning, Myers went back to her vehicle to conduct a warrant check. She called the police dispatcher and provided the dispatcher with Warren's name, race, sex, and date of birth. She was told Warren had a confirmed warrant for his arrest for speeding and failing to appear on the citation. Myers then arrested Warren, conducted a pat-down search, and put him in the backseat of her vehicle. Myers drove Warren to the jail complex.

At the jail, Myers turned Warren over to Detective James Breen who was investigating recent sex-related burglaries in the southwest area of the City. Myers testified that she turned him over to Breen because she believed Breen could connect Warren to these burglaries.

Breen detained Warren and questioned him extensively on his personal background. At the outset of the questioning, Warren asked Breen whether he was under arrest and why he was being questioned. Breen told Warren that he was being detained and questioned because he was a suspect in the reported burglary attempt. Warren was not given a Miranda warning. Warren asked to speak with a lawyer and Breen informed him that he did not have a right to a lawyer because he was not formally accused of any crime. Warren then asked to make a telephone call. This request was also denied. Breen grilled Warren with respect to his whereabouts that

---

* The HONORABLE EARL R. LARSON, Senior United States District Judge for the District of Minnesota, sitting by designation.

evening, his explanation for the guard dog tracking to his car, and his sexual history. When the interrogation ended, he was fingerprinted, handprinted, and photographed by Sergeant David Beggs. Warren was released at 6:30 a.m. after posting bond on the traffic warrant.

Thereafter, Warren filed this section 1983 action against the City and Officer Myers, Sergeant Beggs, and Detective Breen. The complaint alleged that the police officers, pursuant to police department policy, violated Warren's constitutional rights by arresting him without probable cause on April 13, 1985, taking him to the police department, falsely imprisoning him, subjecting him to harassing, crude, and lengthy interrogation without granting his request for counsel, fingerprinting him, and photographing him numerous times. The complaint further alleged Warren suffered severe emotional distress, mental pain, and psychological damage as a result of the intentional acts of the defendants and sought $100,000 in damages from each of the individual officers and from the City. After a three-day trial, the jury returned a verdict in favor of the defendants. The trial court denied Warren's post-trial motions challenging the verdict; this appeal followed.

The issues on appeal are: 1) whether the trial court erred in instructing the jury that Warren had been arrested for a traffic violation when there was evidence that in fact he had been arrested as a suspect in an attempted burglary; 2) whether the trial court erred in instructing the jury as to the law of custodial arrest and interrogation; 3) whether the trial court misinstructed the jury on the law of qualified immunity; and 4) whether the trial court erred in dismissing, at the close of the appellant's case-in-chief, the complaint as to the City of Lincoln and Officer Myers. We agree that the court erred in instructing the jury and in dismissing the City and the arresting officer, and remand for a new trial.

## II. ANALYSIS.

### A. The Arrest and Detention.

The first issue is whether the trial court's "Due Process of Law" instruction[1] was correct. In that instruction, the court

---

1. That instruction states in full:

The Fourteenth Amendment to the Constitution of the United States provides that no state shall deprive any person of his liberty without due process of law. The "liberty" of the individual, which the Constitution thus secures and protects, is not an absolute and unqualified freedom or privilege to do as one pleases at all times and under all circumstances, but is subject always to reasonable restraints including, of course, such restraints as are imposed by law.

After the arrest of the plaintiff in this case and the taking of him to the county-city jail, the police officers had a reasonable period of time in which to do whatever was reasonably necessary to process the plaintiff with respect to the offenses for which he was arrested. He was arrested for speeding and failing to appear in court in connection with the charge of speeding. During that time the officers properly could question Jackson Warren, examine his hands and shoes, photograph him and take his fingerprints, and otherwise subject him to investigation regarding an offense of attempted burglary or any other offense that the officers then had under investigation. The officers, however, could not properly detain Jackson Warren beyond that period of time reasonably necessary to process Jackson Warren with respect to the offenses of speed-

ing and failure to appear, unless they had reasonable grounds to believe that such action was necessary in order to carry out legitimate investigative functions. If they detained him beyond that time without such reasonable grounds, then detaining him beyond that time was a violation of Jackson Warren's constitutional right not to be deprived of his liberty without due process of law.

Processing Jackson Warren with respect to the offenses of speeding and failing to appear properly could include recording information about Jackson Warren, such as name, address, and identifying characteristics, completing ordinary paperwork, and allowing him to arrange for and post bail.

If the officers had such reasonable grounds, they properly could detain Jackson Warren for a reasonable time to question him and otherwise to carry out legitimate investigative functions.

The Fourteenth Amendment to the Constitution also protects a person's right to counsel. A person who has been arrested and taken into custody for speeding and failing to appear on a charge of speeding has a right to obtain counsel. Preventing a person so arrested and in custody from obtaining counsel upon request is a denial of the right to counsel.

told the jury that Jackson Warren "was arrested for speeding and failing to appear in court in connection with the charge of speeding" and that "the officers could properly detain Warren beyond that time necessary to process him with respect to that offense if they had reasonable grounds to believe that such action was necessary in order to carry out legitimate investigative functions."

■ Warren's challenge to this instruction is two-fold: 1) it erroneously advised the jury that Warren was arrested for failing to appear on a traffic warrant instead of submitting the issue of the reason for the arrest to the jury; and 2) it inaccurately defined the terms under which the police could lawfully detain Warren.[2] We find the instruction faulty on both grounds.

### 1. Pretextual Arrest.

■ First, the record is replete with evidence from which the jury could have determined that the arrest of Warren on the traffic offense was but a pretext to get him into custody for questioning regarding the attempted burglary and sex-related burglaries then under investigation by the Lincoln police department. The jury instruction therefore should have provided the jury the opportunity to make the determination. An arrest ostensibly for one purpose but in reality for the primary purpose of furthering an ulterior goal is unreasonable under the fourth and fourteenth amendments. *United States v. Lefkowitz*, 285 U.S. 452, 52 S.Ct. 420, 76 L.Ed. 877 (1932); *Taglavore v. United States*, 291 F.2d 262, 265 (9th Cir.1961); *Missouri v. Blair*, 691 S.W.2d 259 (Mo.1985) (en banc), *cert. dismissed*, —— U.S. ——, 107 S.Ct. 1596, 94 L.Ed.2d 678 (1987). *But cf. United States v. Hawkins*, 811 F.2d 210 (3d Cir.1987) (fact that pretext given for arrest does not render invalid an otherwise constitutional search).

In *Lefkowitz*, prohibition agents attempted to justify their ransacking of a room and seizure of personal papers while executing an arrest warrant as a search incident to an arrest. The search and seizure were held unconstitutional because "[a]n arrest may not be used as a pretext to search for evidence." 285 U.S. at 467, 52 S.Ct. at 424.

In *Taglavore*, the police, suspecting Taglavore of possessing marijuana cigarettes, attempted to execute an arrest warrant for two minor traffic violations in order to search for drugs incident to that arrest. After an altercation, police seized marijuana from Taglavore, and he was subsequently tried and convicted. On appeal, the Court reversed and remanded, reasoning that the police used the traffic warrant as an excuse to search the appellant for marijuana cigarettes and held that "[w]here the arrest is only a sham or a front being used as an excuse for making a search, the arrest itself and the ensuing search are illegal." 291 F.2d at 265. The facts which contributed to the characterization of the attempted arrest on the traffic warrant as pretextual included 1) routine police procedures for traffic offenses were not followed because traffic offenders were not normally taken into custody; and 2) one of the officers testified, "It was assumed that [appellant] had marijuana cigarettes in his possession. We were going to search him for the cigarettes." The Court noted:

> The violation of a constitutional right by a subterfuge cannot be justified, and the circumstances of this case leave no other inference than that this is what was done with the traffic arrest warrant here. Were the use of misdemeanor arrest warrants as a pretext for searching people suspected of felonies to be permitted, a mockery could be made of the Fourth Amendment and its guarantees. The courts must be vigilant to detect and prevent such a misuse of legal processes.

291 F.2d at 266.

*Lefkowitz* and *Taglavore* present situations where an arrest warrant is executed

**2.** Warren objected to the instruction. He did not, however, specifically object to the instruction on the grounds that it did not address the issue of pretextual arrest. Nevertheless, it was incumbent upon the trial court to properly frame the instruction once it was put in issue. *Katch v. Speidel, Division of Textron, Inc.*, 746 F.2d 1136, 1139 (6th Cir.1984); *Celanese Corp. of America v. Vandalia Warehouse Corp.*, 424 F.2d 1176, 1181 (7th Cir.1970).

to justify an otherwise unlawful search as a search incident to that arrest. Nonetheless, we find the reasoning of both cases applicable in the context of an arrest warrant executed for the purpose of justifying detention and interrogation for another crime under investigation.

Applying the law to the facts of this case, we believe the actions of the police in arresting Warren may have violated the fourth amendment. The jury could well have found that Warren's arrest was improperly motivated, undertaken not in furtherance of constitutionally permissible law enforcement but for the purpose of gathering evidence of unrelated crimes for which the officers did not have probable cause to arrest Warren. The jury should have been so instructed.

■ It is undisputed that the police initially stopped Warren because they had reasonable suspicion that he had committed the attempted burglary at 15th and C Streets. A police dog tracked from the scene of the crime to the vicinity of Warren's car. The area was strictly residential and no one else was out on the street at the early hour of 4:30 a.m. When the police officers arrived, Warren attempted to leave the area. Moreover, Warren matched the description the police had of the suspect— "a white male in his 20's, slender build, wearing a light-colored or white short-sleeved shirt." Thus, although the police concede they did not have probable cause to believe Warren had committed the crime, it is clear that they had reasonable suspicion based on his physical appearance, the location of the vehicle, his turn around upon their approach, and the dog track to justify an investigatory stop pursuant to *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

It is also clear that the police had the right to do a warrant check on Warren's driver's license. Finding the outstanding warrant, they could have arrested him for the traffic violation and processed him through normal channels pursuant to that warrant.[3] But there is a question here

whether that was their purpose or whether they arrested him so that they could bring him to police headquarters and question him about that evening's attempted burglary and the recent sex-related burglaries. The evidence shows that interrogation about the burglaries may have been the reason for the arrest. For example, Myers brought Warren to the jail complex and immediately turned him over to Detective Breen, whom she had in the past aided in investigating the sex-related burglaries. In her testimony, Myers explained why she turned Warren over to Breen: "I just felt that further questioning by somebody who was more familiar with the cases [the other burglaries] themselves could eliminate or possibly give us further—a further suspect in the cases."

Myers never told Warren why he was being detained and questioned. Warren waited approximately fifteen minutes before he was led to an interrogation room by Detective Breen. Breen testified at his deposition as to why he interrogated Warren:

Well, * * * some officers had indicated that the police dog had made what they felt was a less than satisfactory trail to his car, * * * a trail that they didn't feel comfortable arresting him for the offense based solely on the track and they therefore made contact with him in the car and they had a warrant and they knew that I was involved in * * * investigating * * * several attempted sexual assaults * * * that would technically be categorized as burglaries that we thought were sexually motivated burglaries and I guess it was their feeling that it might be beneficial for me to talk to him reference those cases.

Breen initially asked Warren for his name and address, about his work and schooling, where he was that evening and who he had been with. But there is evidence to indicate that the purpose of the detention was not limited to the outstanding traffic infractions. Warren asked if he was under arrest, and Breen said that he

---

3. Normal procedures would have entailed taking Warren to correction officers, booking him, setting bond and releasing him promptly upon payment of bond.

was. When Warren asked what he was being questioned for, he was told a "prowling incident." When he asked to speak to a lawyer, Breen told Warren that he did not have a right to a lawyer until he was formally accused of being a prowler. When Warren then asked to make a telephone call, Breen informed Warren that he would have to wait to make his call until Breen was through questioning him.

Furthermore, in the middle of questioning Warren, Breen abruptly turned to the subject of Warren's sexual preference. According to Warren, the interchange was as follows: Breen queried: "Warren are you gay?" Warren asked him why he asked that question. Breen replied that he had been in the business fifteen years and could pick upon these things. When Warren asked him what he meant, he said, "You people have your way of walking and talking differently. What is it, your theater background?" Warren said, "So you're saying that the Lincoln Police Department bases their decisions on such assumptions?" Breen got mad and said, "Just answer the question, Warren. Are you gay or not." Warren told Breen he "could give him the names and addresses and telephone numbers of several women throughout the City of Lincoln who would say whether he was gay."

That Warren may have been arrested for investigative purposes rather than on the traffic warrant is further evidenced by the testimony of Sergeant David Beggs. Beggs, a ballistics expert who had been at the scene of the attempted burglary gathering evidence, arrived at the jail at approximately 6:00 a.m. He testified that he knew Warren was a suspect in the attempted burglary under investigation:

Beggs: I knew that Mr. Warren had been taken into custody.

Q: As a suspect in this attempted burglary?

Beggs: To a certain extent, yes.

Upon arriving at the jail, Beggs went to the room where Breen was questioning Warren. Beggs testified that he examined the bottoms of Warren's shoes and Warren's hands "to see if they were dirty or had any trace evidence from the roof" of the house where the attempted burglary occurred. Breen then took Warren to the identification bureau at the police station. Instead of taking routine prints of the tips of Warren's ten fingers, as would be done for traffic offenses, Beggs did extensive printing of Warren's hands, including the palms, the sides of the hands, and the sides of each finger. Beggs explained that "[i]n some cases, particularly in involved cases [such] as a series of sexual assaults that we've already talked with other officers about, further hand prints are desired because everybody when they grab something do[es] not necessarily grab it with the end of their finger." Mug shots and several Polaroids were also taken of Warren. Warren then asked if he could use the phone and if he was still a suspect in the prowling incident. Breen told Warren that he was no longer the main suspect. After Breen left, Warren went to the desk and was told he could use the phone and could leave if he paid $50. Warren posted bond and went home.

■ On the basis of these facts, a jury could have concluded that Warren's arrest on the traffic warrant was nothing more than a subterfuge or pretext executed to get Warren into police headquarters to be questioned about an unrelated matter and as such was unlawful. Accordingly, the trial court erred in not instructing the jury on the law of pretextual arrest and in dismissing the complaint as to Officer Myers. On remand, the jury should be instructed on the law of pretextual arrest.

**2. Unlawful Detainment.**

■ Even assuming that the Lincoln Police arrested Warren for failing to appear on a traffic warrant, the due process instruction incorrectly stated that the officers were justified in detaining Warren beyond the time necessary to process him on that warrant. Police are not permitted to hold someone in custody beyond the time necessary to process him with respect to the crime of arrest for the sole purpose of trying to connect that person to another crime. To do so is an unlawful seizure.

*See Adams v. United States,* 399 F.2d 574 (D.C.Cir.1968), *cert. denied sub nom. Roots v. United States,* 393 U.S. 1067, 89 S.Ct. 722, 21 L.Ed.2d 710 (1969). In *Adams,* individuals arrested for a robbery, brought to the Robbery Squad offices at Police Headquarters at 2:00 p.m. and booked at 4:00 p.m., were then put in line-ups for other crimes as to which there was no probable cause to arrest or detain them. The court excluded the result of the lineups as the incident of an unlawful arrest and custody for interrogation. The Court explained:

> Here, the lawful basis for appellants' arrest and detention rested solely on the probable cause for the belief that they had committed an attempted robbery on November 5 at the North Carolina Avenue store. There was no probable cause to detain them under arrest for other matters. Rule 5(a) provides that presentment without unnecessary delay shall be made on the charge for which they were arrested. * * * To continue their custody without presentment for the purpose of trying to connect them with other crimes is to hold in custody for investigation only, and that is illegal; its operative effect is essentially the same as a new arrest and, if not supported by probable cause, it is an illegal detention.

> \*　　\*　　\*　　\*　　\*　　\*

> On the precise facts shown by this record, we think the effect of Rule 5(a) is to convert at least as of 4:00 P.M. on the afternoon of appellants' arrest, their continued detention at the police station into an unlawful arrest without probable cause in respect of the crime for which they were convicted. It is not, thus, the precise scope of the *Mallory [Mallory v. United States,* 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957) ] exclusionary rule which is determinative here but, rather, the sweep of the general policy of excluding evidence gathered during a period of detention following upon an unlawful arrest.

> \*　　\*　　\*　　\*　　\*　　\*

> The concept of what is, in legal contemplation, a "divisible detention" is not,

in our view, extraordinary. Indeed, it seems to be a necessary one if the subversion of the purposes of Rule 5(a) is not to be made the handmaiden of the constitutionally defective arrest for investigation.

399 F.2d at 577 (footnotes omitted). *See United States v. Poole,* 495 F.2d 115, 125 (D.C.Cir.1974) (Leventhal, J., concurring), *cert. denied,* 422 U.S. 1048, 95 S.Ct. 2667, 45 L.Ed.2d 701 (1975); *Commonwealth v. Lumb,* 430 A.2d 1188, 1190 (Sup.Ct.Pa. 1981).

The words of former Chief Justice, then Judge Burger in his concurring opinion are instructive:

> To my mind, the importance of the investigation of crimes other than that for which the original arrest was made is not that there may be something resembling a new "arrest," but that the period of "unnecessary delay" forbidden by Fed.R.Crim.P. 5(a) has then been reached. Necessary delay can reasonably relate to time to administratively process an accused with booking, fingerprinting and other steps and sometimes even to make same limited preliminary investigation into his connection with the crime for which he was arrested, especially when it is directed to possible exculpation of the one arrested. However, when delay of presentment to the magistrate is for the purpose of investigation of *other* crimes, then there is no doubt that the "delay" has become "unnecessary." [Emphasis included.]

399 F.2d at 579.

We find the rationale of the *Adams* Court persuasive. Thus, assuming that the arrest was proper, the jury could have found the detention for the purpose of trying to connect Warren with the attempted break-in was illegal. The jury could have found that the detention was an unlawful seizure based solely on reasonable suspicion of the sort prohibited by *Dunaway v. New York,* 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979), and *Florida v. Royer,* 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed. 229 (1983).

The jury should have been instructed that if they found that Warren was held beyond that time necessary to process him with respect to the traffic warrant to investigate him about the attempted burglary, a crime which all three officers admitted that they did not have probable cause to hold Warren on, then that detention was an unlawful one.

### B. Qualified Immunity.

The second issue is whether the trial court's qualified immunity instruction was erroneous.[4]

■ Jackson Warren contends that the instruction erroneously omitted the objective component of the qualified immunity defense. Warren's objection misses the mark because the instruction does contain an objective component. Nevertheless, because this case must be retried, we now make it clear that the question of whether the defendants are entitled to qualified immunity is a question of law to be determined by the trial court.

■ In *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), the Supreme Court established an objective test to determine if an official is entitled to qualified immunity. If the plaintiff alleges facts that demonstrate a constitutional violation, the court may determine, at the summary judgment stage, whether the alleged conduct violated clearly established law of which a reasonable official would have known. 457 U.S. at 818, 102 S.Ct. at 2738. Once a court determines as a matter of law that a legal standard governing the governmental action at issue was clearly

established, there is no qualified immunity. The factual question whether the officer's conduct violated the established constitutional standard is resolved by the jury at trial. *See Davis v. Scherer*, 468 U.S. 183, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984); *Mitchell v. Forsyth*, 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985), *Creighton v. City of St. Paul*, 766 F.2d 1269 (8th Cir. 1985), *cert. granted sub nom. Anderson v. Creighton*, —— U.S. ——, 106 S.Ct. 3292, 92 L.Ed.2d 708 (1986);[5] *Llaguno v. Mingey*, 763 F.2d 1560 (7th Cir.1985) (en banc), *cert. dismissed*, —— U.S. ——, 107 S.Ct. 16, 92 L.Ed.2d 783 (1986); and *Moore v. Marketplace Restaurant, Inc.*, 754 F.2d 1336 (7th Cir.1985).

The district judge in *Llaguno* instructed the jury on the issue of immunity: "The law allows a defendant to defend a charge of unconstitutional entry by claiming a good faith belief that, under the circumstances, it was reasonable to enter the Llaguno house without a warrant. The defendant also must prove that such good faith belief was reasonable."

The Seventh Circuit found error and directed the court on remand to determine the issue of immunity:

The issue of immunity as redefined in *Harlow* is whether when the defendant violated the plaintiff's rights the law appeared to authorize the defendant's misconduct. This is an issue of law, for the judge to decide. What the defendant believed, an issue of fact, is neither here nor there. The good sense of *Harlow* in withdrawing the issue of immunity from

---

4. The trial court delivered the following qualified immunity instruction:

   If it is determined that a defendant in the course of his duties did violate Jackson Warren's constitutional right to due process of law, as defined by these instructions, that defendant nevertheless will have a complete defense to his actions in this suit, if he shows by the greater weight of the evidence that in carrying out his duties with reference to the conduct involved in the case he had to exercise judgment and discretion and that his conduct was in good faith. Good faith means without malice and reasonably believing that what is being done is lawful under all the circumstances then known or which reason-

ably should have been known. A police officer does not act in good faith if he knows or, as a reasonable police officer, should know that his acts probably will result in a deprival of someone's constitutional rights.

5. In its appeal to the Supreme Court, the government argues that the existence of a settled legal principle is not dispositive of an immunity defense. It argues that a second question must be asked before immunity will be determined and that is whether the official reasonably should have known that his conduct was unlawful under the particular circumstances.

the jury is particularly evident in a case such as this, where the police are charged with having acted without probable cause. The question whether they had probable cause depends on what they reasonably believed with reference to the facts that confronted them, as the judge instructed in the passage we quoted earlier. To go on and instruct the jury further that even if the police acted without probable cause they should be exonerated if they reasonably (though erroneously) believed that they were acting reasonably is to confuse the jury and give the defendants two bites of the apple.

*Llaguno*, 763 F.2d at 1569.

Senior Judge Floyd R. Gibson, of this Circuit, expressed a similar view in *Moore v. Marketplace Restaurant*, 754 F.2d at 1361. Judge Gibson, concurring with Judge Posner on this point, stated:

The question of [the police officers'] immunity may be decided as a matter of law and need not be submitted to the jury. It is clearly established that the Fourth Amendment requires that officers have probable cause for an arrest. Thus, if in this case there was no probable cause for the arrests, an issue to be determined by the jury, then there is no immunity under *Harlow*, for the official defendants.

Because we agree with the en banc decision of the Seventh Circuit, we hold that it is for the trial court in this case to determine whether the officers are entitled to qualified immunity.

On remand, the jury should initially determine under proper instructions whether the arrest of Warren was a pretext employed to gather evidence of unrelated crimes. If the jury determines that it was a pretext, then the district court should determine whether the law prohibiting pretextual arrests was clearly established in 1985.[6] If the jury finds that the arrest was not pretextual but rather a lawful arrest pursuant to a traffic warrant, then it should determine whether Warren was detained beyond the time necessary to process the traffic offense for questioning on an unrelated matter. If the jury determines that he was so detained, then the district court should determine whether the law prohibiting such a detention was clearly established in 1985.[7] The jury should finally determine whether the officers continued to question Warren after he requested counsel. If it answers this question affirmatively, then the district court should determine whether the law prohibiting continued custodial questioning after request for counsel was clearly established in 1985.[8]

## C. Municipal Liability.

Warren's final argument is that the district court erred in dismissing the complaint as to the City of Lincoln with prejudice at the close of his case-in-chief. Warren asserts that the jury could have found liability on the part of the city because he proved at trial, through the testimony of the chief of police, that the City of Lincoln failed to train its police officers properly and that this failure caused his injuries.

■ Municipalities may be sued for damages under section 1983 when "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation or decision officially adopted and promulgated by that body's officers" or is "visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels." *Monell v. New York Department of Social Services*, 436 U.S. 658, 690, 98 S.Ct. 2018, 2035–36, 56 L.Ed.2d 611 (1978). Municipalities are in no way immune from liability from constitutional violations.

---

**6.** *See United States v. Lefkowitz,* 285 U.S. 452, 52 S.Ct. 420, 76 L.Ed. 877 (1932); *Taglavore v. United States,* 291 F.2d 262 (9th Cir.1961).

**7.** *See Dunaway v. New York,* 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979); *Adams v. United States,* 399 F.2d 574 (D.C.Cir.1968), *cert.*

denied sub nom. *Roots v. United States,* 393 U.S. 1067, 89 S.Ct. 722, 21 L.Ed.2d 710 (1969); Neb. Rev.Stat. § 29–427.

**8.** *See Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1980).

*Owen v. City of Independence,* 445 U.S. 622, 657, 100 S.Ct. 1398, 1418, 63 L.Ed.2d 673 (1980). If a municipality fails to train its police force, or if it does so in a grossly negligent manner so that it inevitably results in police misconduct, the municipality may fairly be said to have authorized the violations. *Patzner v. Burkett,* 779 F.2d 1363, 1367 (8th Cir.1985); *Kibbe v. City of Springfield,* 777 F.2d 801, 804 (1st Cir. 1985), *cert. dismissed sub. nom. City of Springfield v. Kibbe,* — U.S. —, 107 S.Ct. 1114, 94 L.Ed.2d 293 (1987); *Herrera v. Valentine,* 653 F.2d 1220, 1224 (8th Cir. 1981); *Leite v. City of Providence,* 463 F.Supp. 585, 590 (D.R.I.1978).

 Here, Chief of Police B. Dean Leitner testified that he was responsible "for the administration of the Lincoln Police Department, the perpetuation of all rules and regulations, policies and procedures, and adherences to them." Leitner testified that pursuant to Lincoln police department policy, officers were trained to detain individuals arrested for traffic violations for questioning regarding other matters under investigation. He testified:

> If an officer has reasonable grounds to believe that the individual may be involved in some other offense he certainly would interview the person regarding that. That may occur immediately following the arrest and quite often individuals are taken from the corrections facility following their incarceration and further interviewed pertaining to a case under investigation.

Leitner also stated that a police officer should take an individual into custody to question him if the officer has reasonable suspicion that that individual committed a crime:

> [I]t's the duty of a police officer, if there is reasonable suspicion, to determine whether or not that individual is responsible for that criminal offense. He has an equal duty to gather evidence that will free that individual, prove his innocence, as he does to prove his guilt.
>
> Q. What should the officer do, then?
> A. Interview him.
> Q. Are you saying interview him where the individual is found?
> A. No, I'm not saying that.
> Q. What should the officer do with respect to interviewing?
> A. If he has reasonable suspicion he should take—detain him for questioning either there, or, if necessary, at police headquarters.
> Q. He should take him into custody?
> A. For the purpose of interviewing, yes.

At the very least, these portions of Leitner's testimony put into issue the question of whether the Lincoln police department failed to properly train its officers, and thus it was error for the trial court to dismiss the complaint as to the city. On remand, the jury should be properly instructed on the issue of municipal liability.

Reversed and remanded for a new trial consistent with this opinion.