**Larry COFFMAN, Appellant,**

v.

**Myrna TRICKEY, Appellee.**

No. 88–2520.

United States Court of Appeals, Eighth Circuit.

Submitted June 12, 1989.

Decided Aug. 28, 1989.

Rehearing and Rehearing En Banc Denied Oct. 12, 1989.

Gerald P. Greiman, Clayton, Mo., for appellant.

Kathi L. Chestnut, St. Louis, Mo., for appellee.

Before ARNOLD and MAGILL, Circuit Judges, and HENLEY, Senior Circuit Judge.

HENLEY, Senior Circuit Judge.

Larry Coffman appeals from a final judgment entered in the district court upon a jury verdict in favor of defendant Myrna Trickey on Coffman's claim that he was deprived of liberty without due process of law. We reverse and remand for a new trial.

Coffman has been an inmate at Missouri Eastern Correctional Center (MECC) in Pacific, Missouri since December, 1985. While at MECC, Coffman developed a social correspondence with a Wilma Smith, whom he would later marry while still incarcerated. The two had been corresponding for approximately a month, when on May 2, 1986 Smith, who had driven to MECC with the wife of inmate Sam Gunther, attempted to visit Coffman but was unable to do so because she was only on Gunther's and not Coffman's visiting list.

That evening, Gunther informed Coffman of Smith's attempted visit and gave him a phone number where he could reach her.

Coffman, as allowed by prison policy, called Smith that night. During the conversation, Smith asked Coffman to be on the east end of the prison track the next morning where she could observe him from a church parking lot located outside the prison. On May 3, 1986 Coffman appeared on the prison track, and Smith arrived at the church parking lot at the time agreed upon. Smith got out of her car and stood in front of it so that Coffman could see her.

The duration of this distant rendezvous, by which the two viewed one another for the first time, was approximately a couple of minutes. Smith then waved as she turned to get back in her car, and Coffman waved back. No verbal communication took place or was possible.

After this event occurred, Corrections Officer William Arledge, who witnessed the event, lodged a charge against Coffman for violating Rule 29 of the Missouri Division of Adult Institution Rules, which prohibits "[k]nowingly failing to abide by any published institutional rule." [1] Coffman was immediately placed in administrative segregation for about four hours before being released. Subsequently, Coffman was brought before a Disciplinary Committee and then an Adjustment Board and found guilty of the charge.

Before each body Coffman admitted committing the foregoing acts but denied any wrongdoing. The Adjustment Board recommended as punishment that Coffman be placed in the prison's Special Adjustment Unit because of Coffman's accumulation of other institutional offenses,[2] and because

---

1. Arledge's conduct violation report stated:

   On the above date and time, I, the reporting officer, saw Resident COFFMAN standing on the East end of the track. It appeared that he was trying to have a conversation with a lady that was on the church parking lot. I did see him looking right at her and wave. This was also reported by CO/I PARTNEY, Arthur. This places the resident in violation of Rule #29, VIOLATION OF INSTITUTIONAL RULES.

As can be seen, there is no indication of which institutional rule was broken.

2. The other institutional offenses included: taking two pieces of chicken from behind the serving line, visiting another inmate's room during an inmate count, smoking in a nonsmoking area, and possessing sugar and an apple. Coffman also once received a warning for having his cell door shut. The warning apparently was not taken into account by the prison panels, but it was admitted into evidence at trial. The record shows that the warning and two of the

Coffman admitted "that this was a planned situation." Defendant Myrna Trickey, the Superintendent of MECC, approved the recommendation and Coffman was placed in the Special Adjustment Unit for ninety days.

Coffman brought suit against Trickey, pursuant to 42 U.S.C. § 1983, claiming that she deprived him of his liberty without due process of law, U.S. Const. amend XIV, in that there was no published rule prohibiting what he had done.[3] Just prior to trial, Coffman included a second cause of action claiming that his placement in the Special Adjustment Unit for ninety days violated Missouri law which limits the time that an inmate can be confined in such a unit to ten days. *See* Mo.Rev.Stat. § 217.375.1. Over Trickey's objection that the issue had not been pleaded, the issue was allowed to go to trial.

The evidence at trial showed that Coffman and Smith were separated by approximately one hundred yards, two 16–foot tall chain link fences, one with razor wire on top and the other with barbed wire on top, and that a guard tower was stationed almost directly between them. In addition, Coffman tendered into evidence MECC's "Inmate Conduct Rules" and the Missouri Division of Adult Institution's "Inmate Rulebook." Coffman testified, and, when on the stand, Trickey in turn conceded, that nothing in either set of rules prohibited inmates from waving to people on the other side of the fences. MECC's "Inmate Discipline" rule also was admitted which states *inter alia* that inmates will "be advised in writing of [their] rights and responsibilities, conduct prohibited at this institution, and disciplinary sanctions which may be taken for misconduct of violation of same. This information will be provided in booklet form...."

As part of her case-in-chief, Trickey testified that a number of signs around the institution issue various warnings. First, signs posted on the outermost of the two fences warn outsiders not to communicate with inmates through the fences. Second, signs posted on the innermost fence warn inmates that they will be subject to rifle fire if they approach the fence. Third, a sign outside an airlock entrance to the visiting room instructs inmates not to communicate with visitors through the airlock before entering the visiting room. Coffman in turn testified that, never having had a visitor, he was not aware if there was such a sign. Over Coffman's objection on relevancy grounds, Trickey also offered into evidence and testified about, the visitation rules at MECC. Finally, both sides tendered evidence on the question whether the Missouri statutory ten-day limit on Adjustment Unit confinement applied to MECC's Adjustment Unit and on whether the statute was violated. At no time during the trial did Trickey identify the rule she believed Coffman violated.

At the close of all the evidence, Coffman moved for a directed verdict on both causes of action, which was denied. Coffman also objected to the giving of certain jury instructions, but was overruled. The jury found for Trickey on both counts, and Coffman appealed without filing a motion for judgment *non obstante veredicto*.

Coffman argues that the district court committed four errors, each requiring reversal. Specifically, Coffman claims that the trial court erred by denying his motion for a directed verdict on either (1) his due process claim or (2) his state statutory claim, and in instructing the jury (3) that Trickey could not be held liable if she reasonably believed in good faith that she was acting pursuant to a valid policy, and (4) that Trickey could not be held liable unless she acted with the intent to violate Coffman's constitutional rights. Trickey argues that the evidence was sufficient to

foregoing offenses were reported as violations of Rule 29; however, the specific institutional rule that was violated was specified on each of these charges.

**3.** In his complaint, Coffman included Arledge as a defendant, but voluntarily dismissed his claims against Arledge prior to trial. Coffman also brought a second § 1983 suit on August 31, 1987, *Coffman v. Trickey, et al.,* No. 87–1630, which was consolidated with the case *sub judice.* However, before trial Coffman voluntarily dismissed case No. 87–1630.

support the jury verdict, that the instructions were not in error or, alternatively, were harmless error, and that, because Coffman never moved for JNOV, the most he can receive from this court is a new trial and not an order for entry of judgment.

■ We agree with Coffman that the district court should have granted him a directed verdict on his claim that he was deprived of liberty without due process of law when Trickey punished him for conduct that was not proscribed. A fundamental tenet of due process is that to be sanctioned one must have received fair notice that one's allegedly violative conduct was prohibited. *See Grayned v. City of Rockford,* 408 U.S. 104, 108, 92 S.Ct. 2294, 2298, 33 L.Ed.2d 222 (1972); *Bouie v. City of Columbia,* 378 U.S. 347, 350–51, 84 S.Ct. 1697, 1700–01, 12 L.Ed.2d 894 (1964); *see also Wright v. Arkansas Activities Association,* 501 F.2d 25, 28–29 (8th Cir.1974). It is beyond cavil that this principle applies within the prison setting. *Gibbs v. King,* 779 F.2d 1040, 1044 (5th Cir.), *cert. denied,* 476 U.S. 1117, 106 S.Ct. 1975, 90 L.Ed.2d 659 (1986); *see Remmers v. Brewer,* 475 F.2d 52, 54 (8th Cir.1973) (remanding for a hearing to determine whether prisoner was punished for engaging in legally protected conduct).

Since Coffman was punished for violating a rule which prohibits the violation of a published rule, it was incumbent on Trickey to point to the precise published rule that was violated. Without being coupled to a published rule, Rule 29, standing alone, means nothing or at least would be void for vagueness. *Interstate Circuit, Inc. v. City of Dallas,* 390 U.S. 676, 682–91, 88 S.Ct. 1298, 1302–07, 20 L.Ed.2d 225 (1968); *United States v. Mersky,* 361 U.S. 431, 440–41, 80 S.Ct. 459, 464–65, 4 L.Ed.2d 423 (1960). That Coffman's conduct was "a planned situation" does not alter the requirement that Trickey must show that Coffman's conduct knowingly violated a published institutional rule.

In support of her argument that Coffman violated a published rule, Trickey relies on the four rules introduced at trial. Trickey first relies on the signs that warn outsiders not to communicate with inmates through the fence. However, Trickey admitted that these signs face outward and are directed to those outside the prison. Even if Coffman could have been aware of their existence, the signs do not apply to him.

Second, Trickey relies on the signs facing inward that warn inmates that they will be subject to rifle fire if they attempt to approach the fence. It is uncontroverted that Coffman never attempted to approach the fence. Thus, this rule was never violated.

Third, Trickey relies on the sign outside the airlock entrance to the visiting room. Like the other signs, this sign is irrelevant to the facts of this case. Coffman was on the prison track; his pen pal in a church parking lot. He was not about to "proceed[ ] . . . into the visiting room," to quote Trickey's testimony about the purpose of the sign. This sign is no more applicable to Coffman's "communication" on the track, than it is to his communication by mail or by telephone. Furthermore, it is undisputed that Coffman, never having had a visitor, never saw the sign. Thus, Coffman could not have violated the rule "knowingly," as Rule 29 requires.

Finally, Trickey relies on the MECC visitation rules. These regulations discuss visitation hours, frequency of visits, accessibility to recreation and canteen areas, contact visits, and how an inmate can have a visitor placed on his visiting list so that, as Trickey testified, "[the visitor] can enter the prison." These rules also are irrelevant to the issue here. Trickey conceded this at trial when, in responding to a direct question from the bench, she testified that the visitation rules did not prohibit the conduct for which Coffman was punished. We note Coffman and Smith were not trying to use the visitation room or any of the prison's facilities. Indeed, Smith neither entered the prison, nor trespassed on prison property.

Furthermore, these visitation rules do not purport to govern every form of inmate communication. Like the sign outside the airlock entrance, these rules no more govern this "visit" than they do a telephonic,

postal, or furlough "visit." To the extent that they govern innocuous inmate communications with an outsider, the outsider at least must be physically on prison property.[4] We hold that Trickey failed to identify the published rule that Coffman allegedly violated.

We note that each of Coffman's past Rule 29 conduct violation reports indicated the specific institutional rule that he violated, *see supra* note 2, but that Arledge's report did not, *see supra* note 1. As indicated above, the prison disciplinary panels also failed to cite the rule that Coffman allegedly contravened. Finally, Trickey conceded at trial that each rule that she introduced into evidence or testified about was not really applicable to Coffman's conduct. Never did she cite the specific rule on which she relied when she approved of the punishment. In view of all the evidence, one could not say with any confidence that to this day Coffman knows what rule he violated. Indeed, it is apparent that Trickey does not know. In these circumstances, Coffman's due process right of fair warning could not be satisfied by letting a jury decide on which rule Trickey may have relied. This is particularly true when the jury must pick from four irrelevant rules. We hold that Trickey violated Coffman's constitutional rights by depriving him of liberty without due process of law.

■ We next turn to Coffman's argument that the district court erred in not granting him a directed verdict on his state statutory claim. As a preliminary matter, we first reject Trickey's argument that this cause of action was not properly before the district court because it was not pleaded. The record shows that a second case filed by Coffman that was consolidated with this one, *see supra* note 3, specifically referenced § 217.375.1, and his trial brief in the case *sub judice* detailed this argument. We hold that Trickey had sufficient notice

of this cause of action. *See Greenwood v. Ross,* 778 F.2d 448, 454–56 (8th Cir.1985) (allowing a party who filed a § 1983 suit for retaliation to proceed on various theories of recovery which had not been pleaded). Thus we proceed to a consideration of the merits.

Section 217.375.1 states that an inmate may not be placed in an adjustment unit for more than ten days. *See* Mo.Rev.Stat. § 217.375.1. Trickey, however, argues that the adjustment unit in which Coffman was placed is not governed by § 217.375.1, because the prison has a more restrictive unit in which inmates who commit more serious offenses are confined, and Division Rule 20–1112.010 states that it is this more restrictive unit that is governed by § 217.375.1. In support of her argument Trickey points out and the record shows that in 1986, MECC created a new unit in which to place institutional offenders who could not be timely moved to the overcrowded maximum security prisons. This unit was considered by MECC to be distinct from its more restrictive unit and, thus, not governed by § 217.375.1. Because the statute was considered inapplicable, MECC has not lived by the statute's ten-day limitation.

■ Clearly, this is a matter of statutory interpretation. When the facts are undisputed, as here, the applicability of a statute's terms are a question of law for the court to decide. *Northern Natural Gas Co. v. O'Malley,* 277 F.2d 128, 137 (8th Cir.1960). Thus, it was error for the district court to submit this issue to the jury.

■ We reject Trickey's interpretation of § 217.375.1. It is clear that the Missouri state legislature created two rules for segregating troublesome inmates from the general prison population: one for disciplinary (or punitive) segregation for the confinement of institutional rule breakers, § 217.375.1,[5] and one for administrative

---

**4.** As indicated, the extent of the communication that took place between Coffman and Smith consisted of waving good-bye. Certainly, Coffman and Smith would not view their simple observation of one another as a visit or wish to use it as a substitute for a prison visit.

**5.** Section 217.375.1 reads:

1. An inmate who has violated any rule or regulation of the division or institution relating to the conduct of inmates may, after proper hearing and upon order of the chief administrative officer of the institution, be confined

segregation for the confinement of those who pose an immediate security risk, *id.,* subsec. 2.[6] *See Howard v. Armontrout,* 729 S.W.2d 547, 549 (Mo.App.1987) (per curiam).

Under the statute disciplinary segregation is limited to ten days, and for purposes of this case it is of little consequence whether MECC has two or ten different types of disciplinary adjustment units. The adjustment unit in which Coffman was placed is governed by § 217.375.2, and we hold that Trickey violated the statute by placing Coffman in the unit for more than ten days.

■ Coffman next argues that the district court erred by including an intent element when it instructed the jury on the standard for a constitutional violation.[7] We agree. Coffman is not required to show that Trickey actually intended to violate Coffman's constitutional rights.

By including such an element when charging the jury, the court misled the jury and misconstrued *Daniels v. Williams,* 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986) and *Davidson v. Cannon,* 474 U.S. 344, 106 S.Ct. 668, 88 L.Ed.2d 677 (1986). These cases held that negligence was not a sufficient standard upon which to hold an official liable for a due process violation. *Daniels,* 474 U.S. at 336, 106 S.Ct. at 667; *Davidson,* 474 U.S. at 347–48, 106 S.Ct. at 670–71. Otherwise, the fourteenth amendment would become a font for tort law.

In contrast, no one is claiming here that Trickey committed any act negligently. She did not order Coffman confined to the adjustment unit unintentionally, by acci-

dent, or through a case of mistaken identity. At the same time, *Daniels* and *Davidson* are not to be cited for the converse proposition that the defendant must have the specific intent to violate the plaintiff's legal rights. *See Holt v. Artis,* 843 F.2d 242, 244 (6th Cir.1988); *Franklin v. Aycock,* 795 F.2d 1253, 1261–62 (6th Cir.1986). Therefore, *Daniels* and *Davidson* are not applicable. *See Davidson,* 474 U.S. at 348, 106 S.Ct. at 670; *Wolff v. McDonnell,* 418 U.S. 539, 558, 94 S.Ct. 2963, 2975, 41 L.Ed.2d 935 (1974); *New v. Minneapolis,* 792 F.2d 724, 725–26 (8th Cir.1986) (*Daniels* and *Davidson* do not apply to "[an] intentional abuse of official power ... which infringes a specific constitutional guarantee....").

Next, we address the question whether Trickey was entitled to qualified immunity. We discern some continuing confusion on the appropriate analysis to be employed when a court addresses the issue of qualified immunity. The Supreme Court in *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) "refashioned the qualified immunity doctrine by rejecting any inquiry into an official's state of mind in favor of a wholly objective standard." *Boswell v. Sherburne County,* 849 F.2d 1117, 1120 (8th Cir.1988), *cert. denied,* — U.S. —, 109 S.Ct. 796, 102 L.Ed.2d 787 (1989). That objective standard is whether "the legal norms allegedly violated by the defendant were clearly established at the time of the challenged actions...." *Mitchell v. Forsyth,* 472 U.S. 511, 528, 105 S.Ct. 2806, 2816, 86 L.Ed.2d 411 (1985). "[This] is a question of law to be determined by the trial court." *Warren*

in an adjustment unit for a period not to exceed ten days.
Mo.Rev.Stat. § 217.375.1.

**6.** Section 217.375.2 reads:
2. When it is determined by the chief administrative officer of an institution that an inmate is an immediate security risk, or an inmate is violent, struggling and creating sufficient disturbance to indicate he is not in control of himself, or an inmate is physically violent, or an inmate is in urgent need to be separated from others for his own safety or that of others, the chief administrative officer of the institution may transfer the inmate to

an administrative segregation unit which shall be situated so that the segregation of such inmates from the other inmates of the institution shall be in all respects complete. A hearing shall be held concerning the incident within seventy-two hours.

**7.** Instruction No. 14 read:
Your verdict must be for defendant Myrna Trickey unless you believe defendant acted with deliberate indifference to plaintiff's constitutional right to due process, by intending to violate plaintiff's constitutional right to due process or by acting in reckless disregard to plaintiff's constitutional right to due process.

*v. City of Lincoln,* 816 F.2d 1254, 1261 (8th Cir.1987), *rev'd on other grounds,* 864 F.2d 1436 (8th Cir.) (en banc), *cert. denied,* —— U.S. ——, 109 S.Ct. 2431, 104 L.Ed.2d 988 (1989); *see also Boswell,* 849 F.2d at 1120 (whether an official can prevail is a "purely legal question"). In deciding this issue, a court must consider the information upon which the official acted, although this is not to be confused with a review of the official's subjective intent. *Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034, 3040, 97 L.Ed.2d 523 (1987). "Once a court determines as a matter of law that a legal standard governing the governmental action at issue was clearly established, [the inquiry ends:] there is no qualified immunity." *Warren,* 816 F.2d at 1261.

In the case *sub judice,* the question whether Trickey enjoyed qualified immunity was submitted to the jury to decide.[8] This was error. The jury's role is simply to decide if the defendant's conduct actually violated the established legal standard. *Id.*

■ In the present case, Trickey was not entitled to qualified immunity with respect to Coffman's due process claim. The contours of the right not to be punished for committing a lawful act have been sufficiently established so that Trickey, in charge of a thousand-man high-medium prison, should have known that she was proscribed from punishing Coffman unless his conduct constituted an offense. It is not necessary that her action has been previously held unlawful, but only that, in view of pre-existing law, the unlawfulness of her act is apparent. *Anderson,* 107

S.Ct. at 3039. However, the unlawfulness of Trickey's adverse action in this case is not only apparent from pre-existing case law, *see, e.g., United States v. Larson,* 796 F.2d 244, 246 (8th Cir.1986); *Moore v. Wyrick,* 766 F.2d 1253, 1257 (8th Cir.1985), *cert. denied,* 475 U.S. 1032, 106 S.Ct. 1242, 89 L.Ed.2d 350 (1986), but similar acts have been proscribed. *See Gibbs,* 779 F.2d at 1045.[9]

■ Trickey was entitled, however, to qualified immunity on Coffman's statutory cause of action. The record shows that the placing of institutional violators into the adjustment unit for more than ten days was an established practice at MECC at the time Trickey became the head administrative officer. We have found no prior cases interpreting this state statute as it applies to the adjustment units. In these circumstances, Trickey objectively had reason to believe that her behavior was lawful. Thus, we hold that while the adjustment unit in which Coffman was placed is in fact governed by § 217.375.1, this was not clearly established at the time Trickey acted.

■ Having disposed of each of the issues presented, we normally would remand the case with instructions to enter judgment for Coffman, consistent with this opinion, and to hold a new trial on the issue of damages. *Total Petroleum v. Davis,* 788 F.2d 476, 480 (8th Cir.1986). However, as Trickey notes, Coffman failed to move for JNOV below.

---

8. The jury instruction read:

   If the defendant Myrna Trickey believed that she was acting by authority of a valid policy in authorizing plaintiff's placement into the special adjustment unit, and acted in good faith on the basis of this belief, then her reasonable belief and good faith action would constitute a defense to the plaintiff's claim of due process.

9. The Supreme Court's holding in *Anderson* supports this result. In *Anderson* the issue was whether an "[officer] could establish as a matter of law that a reasonable officer could have believed the search to be lawful." *Anderson,* 107 S.Ct. at 3038. The Court held that in deciding issues of qualified immunity the official must have the opportunity to argue that given

the factual circumstances as he or she knew them, the law in the area was not clearly established. *Id.* at 3039. Trickey, of course, has had the opportunity and has made no argument that the circumstances of this case somehow distinguish it from those which established the law.

   Furthermore, we note that the underlying premise of *Anderson* was the need for notice so that officials could " 'anticipate when their conduct may give rise to liability for damages.' " *Id.* (quoting *Davis v. Scherer,* 468 U.S. 183, 195, 104 S.Ct. 3012, 3019, 82 L.Ed.2d 139 (1984)). This fundamental principle, of course, is precisely the issue here and we discern no reason why the person who is being punished is in any less need of fair notice than is the person who is meting out the punishment.

By failing to move for JNOV, the trial judge was denied the chance to correct any error by the jury and the most Coffman may obtain from this court is a new trial. *See Johnson v. New York, New Haven, & Hartford R.R. Co.*, 344 U.S. 48, 54, 73 S.Ct. 125, 128, 97 L.Ed. 77 (1952); *Total Petroleum*, 788 F.2d at 480.

Thus, consistent with this opinion, the judgment of the district court is reversed and the case is remanded for a new trial. If the legal issues which we have discussed in this opinion recur on the new trial, our holdings with respect to them will of course be authority binding the district court.