UNITED STATES of America, Plaintiff,

v.

**Maude C. CLARKE, Defendant.**

**No. 95–000161–01–CR–W–3.**

United States District Court,
W.D. Missouri,
Western Division.

May 17, 1996.

─

Pat McInerney, United States Attorneys Office, Kansas City, MO, for plaintiff.

Ronald Partee, Kansas City, MO, for defendant.

### ORDER ADOPTING MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

SMITH, District Judge.

On March 3, 1996, the Honorable Robert E. Larsen, United States Magistrate Judge, issued his Report and Recommendation (the "Report") that determined, *inter*, that (1) there was probable cause to support Defendant's arrest, (2) Defendant was properly advised of her *Miranda* rights, and that she voluntarily waived those rights, (3) Defendant was not coerced into making a statement to law enforcement officials, (4) Defendant did not invoke her right to counsel until after she made incriminating statements to law enforcement officials, at which time all interrogation ceased, (5) Defendant's arrest pursuant to Mo.Rev.Stat. § 544.170 was a pretext to avoid compliance with Rule 5(a) of the Federal Rules of Criminal Procedure, and (6) law enforcement officers were required to, but did not, abide by the requirements of Rule 5(a).[1]

 Both Plaintiff and Defendant have filed objections to the Report. The Court has reviewed the Report, the motions and responses that preceded the Report, the transcripts of the hearings held by Judge Larsen, and the parties' objections to the Report. The Court concludes that Judge Larsen's careful and thorough analysis of the law and his application of the law to the facts of this case are correct, and the Report is therefore adopted as the opinion of this Court. The Court reinforces Judge Larsen's legal conclusions with the following statement of law as set forth by the Eighth Circuit:

The requirements of [Rule 5(a)] and the teachings of the Supreme Court in *McNabb v. United States,* 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819 (1943) and *Mallory v. United States,* 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957) are designed to frustrate law-enforcing officers from detaining the arrested person for an unnecessary period of time to enable the officer to extract a confession from the arrested individual. But this salutary principle is not applicable where the person under arrest is in the custody and under the control of local and not federal officers, *unless, of course, the state officers are acting at the direction of or in concert with the federal officers, or there is collaboration between the federal and state authorities.*

*United States v. Morris,* 445 F.2d 1233, 1236 (8th Cir.), *cert. denied,* 404 U.S. 957, 92 S.Ct. 322, 30 L.Ed.2d 273 (1971) (citing cases) (emphasis added).

Accordingly, the Court grants Defendant's motion to suppress evidence of her confession because it was obtained pursuant to an unlawful detention.[2] The parties have indicated that there may be other "fruits" of the detention; however, the Report does not specify anything beyond Defendant's confession. If the parties believe that there is other evidence that should be suppressed, they should bring the matter to Judge Larsen's attention in a timely fashion so that he can make a Report and Recommendation on the matter.

IT IS SO ORDERED.

### REPORT AND RECOMMENDATION TO GRANT DEFENDANT'S MOTION TO SUPPRESS STATEMENTS

LARSEN, United States Magistrate Judge.

Before the court are defendant Maude C. Clarke's motion and supplemental motion to

---

1. Rule 5(a) provides, in pertinent part, as follows:

 Except as otherwise provided in this rule, an officer making an arrest under a warrant issued upon a complaint or any person making an arrest without a warrant must take the arrested person without unnecessary delay before the nearest available federal magistrate judge or, if a federal magistrate judge is not reasonably available, before a state or local judicial officer authorized by 18 USC § 3041.

2. For clarification purposes, the Court points out that there are two independent explanations as to why the detention was improper. The two analyses are set forth as items 5 and 6 in the first page of this Order; namely, that the arrest was pretextual and Rule 5(a) was violated.

suppress her oral statements made to state and federal law enforcement officials on June 22, 1995, on the grounds that (1) the initial stop of defendant's vehicle and the questioning of defendant went beyond a lawful *Terry* stop, (2) defendant's subsequent arrest was without probable cause, (3) all statements made by defendant were coerced, (4) defendant was not timely advised of her Miranda rights, (5) any waiver by defendant of her *Miranda* rights was involuntary, (6) the detention of defendant was improper and any statements given during her detention were tainted, (7) defendant's requests for counsel were not honored, and (8) defendant's arrest was solely for the purpose of coercing a statement from defendant and not for the purpose of initiating prosecution. I find that (1) because this was not purported to be an investigative stop, the dictates of *Terry v. Ohio* are inapplicable, (2) all of the information known by police at the time of defendant's arrest establishes probable cause that she was promoting prostitution, (3) there is no evidence in this record that defendant's statement was coerced, (4) because defendant was advised of her *Miranda* rights before she was questioned, the rights were timely given, (5) because there is nothing equivocal or ambiguous about "I have nothing to hide," and because defendant's actions in willingly answering the questions posed to her immediately after making that statement, defendant sufficiently waived her right to remain silent, (6) because all questioning ceased at the time defendant requested an attorney, her right to counsel was not violated, (7) defendant has not shown that she was unconstitutionally held "incommunicado," (8) the arrest of defendant pursuant to the Missouri 20–hour hold law was an unlawful pretext for investigative purposes, and the government intentionally circumvented procedures in place to protect defendant's constitutional rights, and (9) Rule 5(a) applies to this case because of the working arrangement between the state police and federal agents, and the requirements of Rule 5(a) were not met since defendant was never presented before a judge. Therefore, defendant's motion to suppress should be granted, and all information obtained as a result of her unlawful arrest as well as the fruits of that unlawful arrest should be suppressed.

## I. BACKGROUND

On September 27, 1995, defendant was charged in a ten-count indictment with various crimes in connection with the alleged operation of a prostitution enterprise from her residence. On December 6, 1995, a thirteen-count superseding indictment was returned.

On November 1, 1995, defendant filed a motion to suppress statements obtained from her on June 22, 1995, and the fruits of such statements (document number 32), on the grounds that (1) the initial stop of defendant's vehicle and the questioning of defendant went beyond a lawful *Terry* stop, (2) defendant's subsequent arrest was without probable cause, (3) all statements made by defendant were coerced, (4) defendant was not timely advised of her Miranda rights, (5) any waiver by defendant of her *Miranda* rights was involuntary, (6) the detention of defendant was improper and any statements given during her detention were tainted.

On November 8, 1995, the government filed its response to defendant's motion (document number 41) in which it argues that both the initial stop of defendant and her subsequent arrest were supported by probable cause, that defendant was properly detained pursuant to Missouri's "twenty hour hold" law, and that defendant voluntarily waived her *Miranda* rights and did not at any time request an attorney.

On November 16, 1995, I held a hearing on defendant's motion to suppress statements. Defendant was present represented by Ronald Partee. The government was represented by Assistant United States Attorney Patrick McInerney. Three witnesses testified for the government and four exhibits were admitted. The witnesses were:

1. Daniel David Hernandez, a detective with the Vice Unit of the Kansas City, Missouri Police Department;

2. John Rooney, a detective with the Vice Unit of the Kansas City, Missouri Police Department; and

3. Steven S. Gasvoda, a special agent with the United States Secret Service.

The exhibits were:

1. P. Ex. 1, Kansas City, Missouri Police Department Detective Investigation Report on Maude C. Clarke;

2. P. Ex. 2, U.S. Secret Service Miranda Warning and Waiver Card;

3. P. Ex. 2A, copy of U.S. Secret Service Miranda Warning and Waiver Card;

4. Ct. Ex. 1, Wanted/Cancellation Notice, Kansas City, Missouri Police Department on Maude C. Clarke.

Subsequent to the hearing an extension of the date for filing pretrial motions was granted, and defendant filed a supplement to her motion to suppress statements (document number 148). In her supplemental motion, defendant argues that her statements should be suppressed on the additional grounds that her request for an attorney was not honored during her interrogation and that her arrest was effectuated without probable cause for the sole purpose of coercing a statement from her and not for the purpose of initiating her prosecution; and that she was held "incommunicado" in violation of law for the purpose of coercing an incriminating statement from her.

On March 4, 1996, the government filed its response to the defendant's supplemental suggestions (document number 157) reasserting its reliance on Missouri's 20–hour hold rule (Mo.Rev.Stat. 544.170) and arguing:

> The "pick up orders" at issue were entered into the computer by Detective Rooney and were based on the same facts and circumstances as was the United States' application for a search warrant to search Maude Clarke's residence, the business location of the prostitution enterprise. Where the search warrant had sought to search the locus of the business, the pick up orders sought to detain, for the purpose of questioning, the women identified as employees of the business, all of whom were identified in the affidavit. (Document number 157, page 3.)

## II. FINDINGS OF FACT

On the basis of the evidence adduced at the suppression hearing, I submit the following findings of fact:

1. In approximately November 1994 a joint federal-state investigation involving defendant Maude Clarke who was suspected of running a prostitution business from her residence at 907 East 42nd Street, Kansas City, Missouri began (1Tr. at 9, 26, 27, 36, 63, 74, 104).[1] The investigation involved approximately 15 officers and agents from the United States Secret Service; the Internal Revenue Service; the Bureau of Alcohol, Tobacco and Firearms; the Kansas City, Missouri Police Department; the Johnson County, Kansas Sheriff's Office; and the Mission, Kansas Police Department (1Tr. at 26–27, 37, 63, 77). The agents and officers had numerous meetings with Assistant United States Attorney Pat McInerney during the investigation (1Tr. at 64, 77; 2Tr. at 73). State prosecutors had no involvement whatsoever in this investigation (1Tr. at 64; 2Tr. at 73, 74). Rather, the investigation was run solely by the Organized Crime Strike Force Unit of the United States Attorney's Office (2Tr. at 318, 321).

2. From February 1, 1995, until the end of June 1995, pen registers and trap and trace devices in the office of the United States Secret Service monitored telephone lines at defendant's residence and at four escort services listed in the phone book (1Tr. at 54–55, 75, 105–106). The police learned through the telephone company that all of those numbers were either call forwarded or remote call forwarded to defendant's residence and were in the names of MCC Remodeling Company or in defendant's name (1Tr. at 106).

3. Agents learned from the telephone devices that calls would come into defendant's residence, often from hotels and motels; and then shortly thereafter, a call would go out of defendant's residence to a pager, a mobile phone or a residence of one of the women working for defendant (1Tr. at 107–108, 113). The person phoned would then immediately call defendant's residence (1Tr. at 108, 113).

---

**1.** "1Tr." refers to the transcript of the evidentia- ry hearing held on November 9, 1995.

Approximately one hour later, another call would come into defendant's residence from the original number, i.e., the hotel or motel (1Tr. at 108, 114). While that party was still on the line, the private line would go off hook, and someone at that number would make a phone call to Visa or Mastercard to verify a credit card (1Tr. at 108, 114). Finally, either 20, 30 or 60 minutes later, someone at defendant's residence would again call the original number (1Tr. at 108, 114). This along with surveillance indicated to the police that the final call was a notification that "time was up" (1Tr. at 108). From the first part of March through the middle of June, approximately 40,000 calls were made or received at defendant's residence (1Tr. at 109).

4. The Kansas City, Missouri Police Department conducted trash pick-ups at defendant's residence, conducted mobile and stationary surveillance of defendant, and interviewed some of the suspected clients (1Tr. at 104).

5. Through the trash pick-ups, police recovered documents containing women's names, amounts of money, and "tips" (1Tr. at 105). The documents also contained names from hotels, directions to a house or motel, deposit slips, and a telephone credit card listed to Maude Clarke d/b/a Affairs D'Amour (1Tr. at 105).

6. Physical surveillance of defendant's residence was conducted from a nearby apartment rented by the police (1Tr. at 110). Women were seen carrying documents into defendant's residence, remaining inside only briefly, then returning to their cars and leaving without the documents (1Tr. at 110). Defendant was observed meeting women in various parts of the city. During these meetings, the women would get into defendant's car with documents, then get back out of the car without the documents (1Tr. at 111).

7. The police used the license plate numbers of the women dealing with defendant along with the information obtained from the pen registers to identify women working for defendant (1Tr. at 111). When possible, those women were surveilled leaving their homes and arriving at and leaving the motels and hotels (1Tr. at 112). The agent monitor-

ing the pen registers alerted other officers which woman would probably be meeting a client at which hotel, and the other officers' attempted to reach the woman's house before she left in order to follow her to the hotel or motel (1Tr. at 112, 114). Then, if possible, an undercover officer would follow the woman into the hotel, ride the elevator with her, and follow her to her room in order to learn her room number (1Tr. at 112–113). At times, a detective or special agent would conduct a "knock and talk" with the client after the woman had left (1Tr. at 115). The officer would knock on the door, identify himself or herself as a law enforcement officer, and ask to speak to the man about what had just occurred (1Tr. at 115). The officers were often told by the clients that they had paid with a credit card for sex (1Tr. at 115). The credit card receipts provided by the clients showed prices ranging from $185 to $1,700 and listed the merchant as MCC Company (1Tr. at 116). The police were able to follow all of these events approximately four to six times (1Tr. at 118–119).

8. Grand jury subpoenas were used to obtain copies of checks written on the account of MCC Remodeling (1Tr. at 117). Checks written to the women suspected of working as prostitutes were recovered (1Tr. at 117). Other checks were written to credit card companies and schools (1Tr. at 117).

9. Sometime prior to June 22, 1995, Special Agent Steven Gasvoda of the United States Secret Service, as case agent for this investigation, prepared an affidavit for the purpose of obtaining a warrant to search defendant's residence (1Tr. at 76, 91). The warrant was obtained on June 21, 1995, from Chief United States Magistrate Judge John Maughmer (1Tr. at 76, 91). In addition, a federal temporary restraining order was issued on June 21, 1995, to seize real estate and personal property including bank accounts (1Tr. at 92). The temporary stay was issued by U.S. District Judge Joseph E. Stevens, Jr., and the 90–day stay was issued by Chief U.S. District Judge D. Brook Bartlett (1Tr. at 92).

10. Detective Rooney asked Agent Gasvoda about issuing pick-up orders on the sus-

pects in this case (1Tr. at 98). Agent Gasvoda consulted with AUSA Pat McInerney to find out whether it would be legal and told Detective Rooney that he believed issuing pick-up orders was a good idea tactically and investigatively (1Tr. at 98; 2Tr. at 328, 329). AUSA McInerney stated that he did not believe there was a problem with issuing the pick-up orders (2Tr. at 328, 330).

11. The purpose of a pick-up is to "bring [the] individual into custody, get them fingerprinted, photographed, see if they want to talk and tell their side of the story before [the police] present the case" (2Tr. at 14).[2] In determining whether to issue a pick-up order, a detective determines whether he or she "has enough information that if we wanted to charge them, we could at that time" (2Tr. at 76). A pick-up gives police "the authority to arrest [people] and bring them down and book them where they would be held for 20 hours" (2Tr. at 15). Federal agents cannot arrest people pursuant to a state pick-up order, and suspects cannot be arrested on a pick-up order outside of Missouri (2Tr. at 165–166). According to Detective Hernandez, a pick-up is entered in the police computer once an officer believes he or she has enough information and evidence to allow the police to "pick up an individual, hold them for 20 hours' investigation." (1Tr. at 37). According to Detective Rooney, a pick-up "allows [an] individual to be placed under arrest and taken to Headquarters and be booked for 20 hours." (1Tr. at 38). When an individual is arrested on a "20–hour hold," a detective interviews the arrestee; and then sometime during the 20 hours, the detective "can either present the case to filing of charges on an individual, or they can release an individual pending further investigation." (1Tr. at 39; 2Tr. at 137–138). With approval of a supervisor, a detective may authorize an individual's arrest merely by entering a pick-up into the computer (1Tr. at 67; 2Tr. at 14). The pick-up order does not reflect the "probable cause" on which it is based (2Tr. at 33). Federal agents have no authority to arrest people for an investigative purpose (2Tr. at 325, 326).

12. Approximately one week before the execution of the search warrant, a meeting was held involving AUSA Pat McInerney, various federal agents, Sergeant Hargarden and Detective Rooney (1Tr. at 71; 2Tr. at 77). During that meeting, it was decided which individuals would be the subject of "pick-up orders" (1Tr. at 72, 77).

13. It was decided that federal grand jury subpoenas would be obtained for all of the suspects residing in Kansas in the event they were found in Kansas and refused to voluntarily provide fingerprints and photographs, since Missouri pick-up orders were no good in Kansas and Kansas has no comparable "20–hour hold" law (2Tr. at 191, 194, 195, 290–291, 320). However, if the Kansas resident was found in Missouri, the officers made the investigative arrests rather than serve the subpoenas (2Tr. at 291, 293). The police officers were instructed by the United States Secret Service to attempt to get fingerprints, photographs and statements from those individuals who were found in Kansas before actually serving the grand jury subpoenas (2Tr. at 192). The subpoenas were obtained the same time as the search warrant (2Tr. at 190).

14. In issuing the pick-up orders, no one at this meeting intended to present any of these individuals to a state prosecutor (1Tr. at 72, 100; 2Tr. at 30, 51, 75, 155, 326, 328). The sole purpose of issuing the pick-up orders was to interrogate the women and obtain photographs and fingerprints (2Tr. at 30, 74–75, 154, 290, 291, 326, 328).

15. On June 21, 1995, Sergeant Hargarden, Supervisor of the Kansas City, Missouri Police Department Vice Unit, conducted a strategy session during which it was decided that defendant would be arrested pursuant to a pick-up order whether she remained in the

---

**2.** "2Tr." refers to the transcript of the evidentiary hearing held on February 26, 1996, pursuant to codefendant Marilyn Roberts' motion to suppress evidence. As the issues in each motion were the same (i.e., the legality of arrests pursuant to Missouri's 20–hour hold law solely for investigative purposes), the same Assistant United States Attorney appeared on behalf of the government, and there is very little, if any, factual dispute, I have occasionally referred to testimony of the Roberts' hearing for the purpose of presenting a clear understanding of what actually occurred.

residence during execution of the search warrant or left prior to police entry (1Tr. at 14, 33, 57). Detective John Rooney of the Kansas City, Missouri Police Department was to enter in the police computer (the ALERT system) a pick-up order on defendant at approximately 6:45 a.m. the following day—June 22, 1995 (1Tr. at 33–33, 38, 55). A tactical team was organized to execute the search warrant on defendant's residence, and it was decided that detectives from the various police departments would be paired up with agents from the federal agencies to conduct interviews of those individuals who were arrested pursuant to the pick-up orders (1Tr. at 39).

16. At 6:00 a.m. on June 22, 1995, Detective Hernandez began surveillance of defendant's residence at 907 East 42nd Street (1Tr. at 10). Hernandez positioned his undercover vehicle approximately one block from the residence (1Tr. at 10). Detective Hernandez was dressed in a pullover shirt, blue jeans and tennis shoes (1Tr. at 13). He had a small beard and wore his police badge in a leather case attached to a silver chain around his neck (1Tr. at 13).

17. Detective Monty Tinkler, Detective Jeff Stockdale and Officer Sharon Mills were each positioned in undercover vehicles within a block or so of the residence (1Tr. at 11, 20). Officer Sharon Mills was present for the purpose of frisking defendant, since it was anticipated that defendant would be arrested that day (1Tr. at 17).

18. The undercover vehicles were not equipped with sirens or lights and had no police identification on them (1Tr. at 14, 20).

19. At approximately 7:00 a.m., Detective Rooney arrived at the police station to enter pick-ups in the ALERT system on some 14 individuals, including defendant Maude Clarke, in connection with the prostitution investigation (1Tr. at 37, 39, 52, 55, 64). At the time he entered the pick-up orders, Detective Rooney knew that it was likely federal charges would be brought as a result of this investigation and that the evidence that would be gathered as a result of these pick-ups would be utilized in a federal investigation (2Tr. at 22).[3]

20. At approximately 7:35 a.m., Detective Tinkler notified Detective Hernandez that a white female had exited the residence and entered a white-over-red Oldsmobile convertible (1Tr. at 11–13). Hernandez radioed this information to Sergeant Hargarden who instructed Hernandez to follow the car (1Tr. at 13). When Detective Hernandez advised Sergeant Hargarden that defendant's vehicle was at 41st Street, Hargarden instructed Hernandez to pull the car over to "conduct a car check" (1Tr. at 14, 28, 30–31). Defendant had not violated any traffic ordinances and had not done anything unusual that would have caused Hernandez to stop her (1Tr. at 31).

21. Detective Hernandez pulled his car, windows rolled down, to the left of defendant's car and honked his horn (1Tr. at 14). He told her through the window to pull over, and defendant complied (1Tr. at 14, 22). Hernandez exited his car, held up the badge that was attached to the silver chain and said "Police Officer, turn the car off, and step to the rear" (1Tr. at 15). Defendant asked to see more identification than the badge (1Tr. at 15). Detective Hernandez pulled his shirt up, took his revolver out of his waistband, and said "Police Officer" (1Tr. at 16).

22. As defendant stepped to the rear of her vehicle, Detective Stockdale and Officer Mills arrived, each in a separate vehicle (1Tr. at 16–17). Defendant asked why she was being stopped, and Hernandez replied "Step to the rear. We'll be with you in a moment." (1Tr. at 17). Shortly thereafter, three uniformed officers arrived, also in separate cars (1Tr. at 18, 24). Lastly, a patrol wagon arrived (1Tr. at 18). There were a total of eight police vehicles surrounding defendant's car (1Tr. at 24). Defendant was arrested pursuant to the pick-up order that had been entered in the ALERT system of the Kansas City, Missouri Police Department computer (1Tr. at 32). She was then placed in the patrol wagon and transported downtown to Central Detention (1Tr. at 18, 25). Defendant was transported without shoes, even though Detective Hernandez saw her shoes

---

3. Detective Panuco was aware of this as well (2Tr. at 155).

in the front seat of her vehicle (1Tr. at 18, 25).

23. Detective Hernandez searched defendant's vehicle which was towed to a special location rather than the regular tow lot (1Tr. at 18, 70, 93). Defendant's car had been towed in anticipation of forfeiture pursuant to the federal forfeiture statute (1Tr. at 70, 93).

24. The search of defendant's residence began at approximately 8:00 a.m. on June 22, 1995 (1Tr. at 23, 78). The entry team consisted of six officers and one sergeant (1Tr. at 56). Detective Rooney arrived at the residence after the entry team had gone into the house (1Tr. at 56).

25. At approximately 7:15 p.m., Special Agent Gasvoda and Detective Rooney went to police headquarters where defendant was being held (1Tr. at 40, 57, 78). Defendant was brought to an interview room where Special Agent Gasvoda began questioning her (1Tr. at 42, 69, 79). At the beginning of the interview, defendant began sobbing (1Tr. at 47, 79). After Detective Rooney brought defendant some water and tissues, the questioning continued (1Tr. at 47–48). Agent Gasvoda first told defendant that he needed to get some personal information from her (1Tr. at 43, 59, 80). The information obtained did not relate to the offense for which defendant was to be questioned (1Tr. at 44, 80). The form (P.Ex. 1) indicated that defendant had been arrested for "promoting prostitution" (1Tr. at 59). It took approximately ten minutes to gather the personal information (1Tr. at 81, 94).

26. After the personal information was obtained and recorded (P.Ex. 1), Agent Gasvoda read defendant her *Miranda* rights from a card (1Tr. at 45, 81). Defendant stated that she understood her rights and said that she had nothing to hide (1Tr. at 46, 83, 90). Defendant was not presented with a written waiver form because Agent Gasvoda was leading the questioning and he does not normally use *Miranda* waiver forms (1Tr. at 46–47, 60, 69–70, 87, 94). It is the policy of the Kansas City, Missouri Police Department to attempt to obtain written waivers of *Miranda* rights (1Tr. at 61).

27. Defendant was questioned about the prostitution business and stated that she had an escort service and a remodeling business (1 Tr. at 47, 84). The questioning lasted one to one and three-fourths hours (1Tr. at 48, 49, 94). Defendant was asked if she would give a written statement and she refused, indicating that she would not give a written statement or sign anything without an attorney (1Tr. at 48, 86). This was the first time defendant mentioned an attorney during this interrogation (1Tr. at 48, 88). At the time defendant requested an attorney, the interrogation was already finished (1Tr. at 86). Defendant was then returned to the detention unit (1Tr. at 49). Agent Gasvoda conducted the entire interview (1Tr. at 69).

28. Detective Rooney did not make any notes during the interrogation of defendant (1Tr. at 61). Rooney and Agent Gasvoda briefly discussed "basic things" relating to the interrogation afterward (1Tr. at 62).

29. Detective Rooney then prepared a release form stating that defendant could be released "pending further investigation" (1Tr. at 49).

30. A total of 9 or 10 of the original 14 individuals entered into the ALERT system were actually picked up on June 22, 1995 (1Tr. at 64, 65). Those 9 or 10 were taken to various detention units throughout the city in outlying patrol divisions (1Tr. at 64). The reason the individuals were separated was the police and agents did not want to give the individuals an opportunity to "get their stories together" (1Tr. at 66). Subsequent to being interrogated, the arrestees were transferred to the main detention unit (1Tr. at 66). None of these individuals were processed through the state system (1 Tr. at 69, 99).

31. After the women were interrogated, a detective released them without conferring with the federal prosecutor or with the county prosecutor (2Tr. at 79).[4]

32. Agent Gasvoda conferred with AUSA Pat McInerney about defendant's car, and it was decided that no seizure warrant would

4. Detective Panuco, however, testified first that the decision of whether to release these women rested with the federal agent in charge (2Tr. at 161, 175–176).

be issued and that the car would be returned (1Tr. at 88).

33. One additional individual was picked up after June 22, 1995 (1Tr. at 65). The other individuals were located in Kansas, and the police cannot arrest someone in Kansas based on a pick-up order issued in Kansas City, Missouri (1Tr. at 65).

### III. TERRY STOP

 Defendant argues that the initial stop of her vehicle and the subsequent questioning went beyond a lawful *Terry* stop. In *Terry v. Ohio,* 392 U.S. 1, 12, 88 S.Ct. 1868, 1875, 20 L.Ed.2d 889 (1968), the Supreme Court held that officers may make an investigative stop if they have a reasonable suspicion supported by articulable facts that criminal activity may be afoot. Absent probable cause, officers may not go beyond checking out the suspicious circumstances that led to the original stop without violating the fourth amendment. *Dunaway v. New York,* 442 U.S. 200, 212, 99 S.Ct. 2248, 2256, 60 L.Ed.2d 824 (1979). Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen has a seizure occurred. *United States v. Mendenhall,* 446 U.S. 544, 552, 100 S.Ct. 1870, 1876, 64 L.Ed.2d 497 (1980). A "show of authority" amounting to a seizure occurs only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that she was not free to leave. *California v. Hodari D.,* 499 U.S. 621, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991) (citing *Mendenhall,* 446 U.S. at 554, 100 S.Ct. at 1877).

 Defendant offers no argument or analysis other than her brief statement that the stop exceeded the scope of *Terry.* The government argues that the stop at issue did not constitute a *Terry* stop, rather it was a full-blown arrest based on both probable cause and the pick-up order for the 20-hour hold.

I find that *Terry v. Ohio* does not apply since this was obviously a full-blown arrest which the government concedes. Defendant was pulled over based on nothing but the pick-up order—there was absolutely no other

basis for stopping defendant's car. Detective Hernandez displayed his revolver and told defendant to get out of her car. Defendant was transported in a patrol wagon to a detention facility and held for 12 hours before Agent Gasvoda and Detective Rooney began interrogating her. The interrogation lasted from one to one and three-fourths hours, and defendant was returned to the detention unit before eventually being released. Defendant's car was towed to a special tow lot in anticipation of forfeiture, and she did not get the car back until the following day.

The government does not contend that the stop of defendant was an investigative stop. Indeed to argue that this incident was anything less than an arrest would be absurd. Therefore, because this was not purported to be an investigative stop, the dictates of *Terry v. Ohio* are inapplicable and defendant's motion to dismiss on this basis should be denied.

### IV. PROBABLE CAUSE TO ARREST

Defendant argues that her arrest was without probable cause. The government, in its response, states as follows:

> The issue of probable cause to arrest the defendant is addressed above and will be the subject of evidence at the hearing upon this motion.

The government does not address the issue of probable cause other than to say it existed. Therefore, I will assume that the government's reference to probable cause being "addressed above" in its response is a reference to the factual background. During the evidentiary hearing, however, the government concluded its presentation of evidence without putting on any evidence of probable cause. After a suggestion that probable cause evidence might be helpful since it was an issue, the government did indeed present that evidence (1Tr. at 100–102).

 Probable cause exists if the facts and circumstances within the arresting officer's knowledge were sufficient to warrant a prudent person's belief that the suspect had committed or was committing an offense. *Hunter v. Bryant,* 502 U.S. 224, 228, 112 S.Ct. 534, 536–37, 116 L.Ed.2d 589 (1991);

*United States v. Magness,* 69 F.3d 872, 874 (8th Cir.1995). Probable cause may be based on the collective knowledge of all law enforcement officers involved in an investigation and need not be based solely upon the information within the knowledge of the officer on the scene. *United States v. Horne,* 4 F.3d 579, 585 (8th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1121, 127 L.Ed.2d 430 (1994).

■ I find that there was probable cause to arrest defendant for conspiracy to violate the Travel Act, in violation of 18 U.S.C. § 1952(a), with which she was eventually charged, or promoting prostitution, in violation of V.A.M.S. § 567.060. At the time of defendant's arrest, the officers and agents were aware of the following:

Calls would go into defendant's residence, often from hotels and motels; and then shortly thereafter, a call would go out of defendant's residence to a pager, a mobile phone or a residence of one of the women working for defendant. The person phoned would then immediately call defendant's residence. Approximately one hour later, another call would come into defendant's residence from the original number, i.e., the hotel or motel. While that party was still on the line, the private would go off hook, and someone at that number would make a phone call to Visa or Mastercard to verify a credit card. Finally, either 20, 30 or 60 minutes later, someone at defendant's residence would again call the original number. This along with surveillance indicated to the police that the final call was a notification that "time was up." From the first part of March through the middle of June, approximately 40,000 calls were made or received at defendant's residence.

Through the trash pick-ups at defendant's residence, police recovered documents containing women's names, amounts of money, and tips. The documents also contained names from hotels, directions to a house or motel, deposit slips, and a telephone credit card listed to Maude Clarke d/b/a Affairs D'Amour. Through physical surveillance of defendant's residence, police saw women carry documents into defendant's residence, remain inside only briefly, then return to their cars and leave without the documents. Defendant was observed meeting women in various parts of the city. During these meetings, the women would get into defendant's car with documents, then get back out of the car without the documents.

Several times, an officer monitoring the pen registers was able to determine which woman would probably be meeting a client at which hotel and notified other officers who followed the woman to the hotel or motel. An undercover officer followed the woman into the hotel and to her room in order to learn her room number, then conducted a "knock and talk" with the client after the woman had left. The officers were told by the clients that they had paid with a credit card for sex. The credit card receipts provided by the clients showed prices ranging from $185 to $1,700 and listed the merchant as MCC Company.

All of the above which was known by police at the time of defendant's arrest establishes probable cause that she was promoting prostitution. A person commits the crime of promoting prostitution if she "knowingly promotes prostitution by managing, supervising, controlling or owning ... a prostitution business or enterprise involving prostitution activity by two or more prostitutes." V.A.M.S. § 567.060.

Because Detective Hernandez had probable cause to believe that defendant had engaged in the crime of promoting prostitution, the defendant's motion to suppress on this basis should be denied.

## V. COERCION

■ Defendant argues that all of her statements were coerced. After reciting the law on admissibility of statements, defendant neglects to explain how that law applies to her case. Nevertheless, based on the evidence presented at the hearing, I conclude that defendant knowingly waived her *Miranda* rights.

After personal information was obtained, Agent Gasvoda read defendant her *Miranda* rights. Defendant stated that she understood her rights and said that she had nothing to hide. Thereafter, defendant made a

statement which contained incriminating remarks.

There is no evidence in this record to indicate that defendant's statements were coerced. Although it is fair to say that the agents and officers handled defendant roughly by pulling her off the street in the early morning hours without a warrant, transporting her to jail without her shoes, and letting her sit for twelve hours before conducting the interrogation, there is no evidence that this treatment coerced the defendant into making a statement.[5] Therefore, defendant's motion on this basis should be denied.

## VI. TIMELY MIRANDA RIGHTS

■ Defendant argues that she was not timely advised of her *Miranda* rights. Defendant was arrested just after 7:30 a.m. Approximately twelve hours later, she was brought to in interview room where Special Agent Gasvoda began questioning her. There is no evidence that defendant was questioned prior to this time. Agent Gasvoda first told defendant that he needed to get some personal information from her. The information obtained did not relate to the offense for which defendant was to be questioned. The personal information included defendant's name, alias, race sex, date of birth, height, weight, hair color, eye color, address, telephone number, social security number, marital status, children, names and addresses of parents and other relatives, place of employment, military record, an automobile ownership. It took approximately ten minutes to gather this personal information.

*Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), requires a suspect to be advised of (among other things) her right to remain silent and to have an attorney with her during questioning. Law enforcement officers are required to advise a

suspect of her *Miranda* rights only if custodial interrogation takes place. *Id.*

■ It is well established that *Miranda* does not apply to biographical data necessary to complete booking, such as name, birth information, address, height and weight. *Rhode Island v. Innis,* 446 U.S. 291, 301, 100 S.Ct. 1682, 1689–90, 64 L.Ed.2d 297 (1980); *United States v. Horton,* 873 F.2d 180, 181 n. 2 (8th Cir.1989). *See also United States v. Dougall,* 919 F.2d 932, 935 (5th Cir.1990), *cert. denied,* 501 U.S. 1234, 111 S.Ct. 2860, 115 L.Ed.2d 1027 (1991); *United States v. Taylor,* 799 F.2d 126, 128 (4th Cir.1986), *cert. denied,* 479 U.S. 1093, 107 S.Ct. 1308, 94 L.Ed.2d 162 (1987).

There is no evidence that defendant was interrogated during the twelve hours between her arrest and the questioning by Agent Gasvoda. *Miranda* warnings are not required prior to questioning a defendant about biographical information. Defendant was advised of her *Miranda* rights before she was questioned about a criminal offense.

Therefore, because defendant was timely advised of her *Miranda* rights, defendant's motion to suppress on this basis should be denied.

## VII. WAIVER OF MIRANDA RIGHTS

Defendant next argues that any waiver by defendant of her *Miranda* rights was involuntary. She provides numerous cites holding that involuntary statements are inadmissible; however, defendant fails to apply the cited law to the facts of this case.

■ If an individual indicates in any manner, at any time prior to or during questioning, that she wishes to remain silent, the interrogation must cease. *Miranda v. Arizona,* 384 U.S. 436, 473–74, 86 S.Ct. 1602, 1627–28, 16 L.Ed.2d 694 (1966). Invocation of the right to remain silent must be construed liberally. *Hoffman v. United States,*

---

5. In her motion, defendant argues that she was placed in a holding cell which had broken glass and dried blood on the floor. As she was still barefoot, she cut her feet. She was not given any food or water and was not allowed to use the bathroom. She repeatedly asked the jailer to call her lawyer, but the jailer was instructed by one of the arresting officers not to let defendant make a call. When defendant was taken to the interrogation room, she was told that if she did not tell the truth she would be taken back to the holding cell to complete a 20–hour hold. However, no evidence of any of this was presented at the hearing. Therefore, I cannot consider any of these allegations in my analysis of coercion.

341 U.S. 479, 486, 71 S.Ct. 814, 818, 95 L.Ed. 1118 (1951). An accused need not rely on "talismanic phrases" or any special combination of words to invoke the right. *Quinn v. United States,* 349 U.S. 155, 162, 75 S.Ct. 668, 673, 99 L.Ed. 964 (1955). Even an equivocal indication of the desire to remain silent can suffice to invoke *Miranda's* requirement that interrogation cease. *Bobo v. Kolb,* 969 F.2d 391 (7th Cir.1992); *Jacobs v. Singletary,* 952 F.2d 1282, 1291–92 (11th Cir. 1992); *United States v. D'Antoni,* 856 F.2d 975, 980 (7th Cir.1988). The suspect must only in some manner evidence a refusal to talk further. *Jacobs v. Singletary,* 952 F.2d at 1292.

▮▮▮ Law enforcement officials therefore must cease an interrogation if the suspect provides merely an "equivocal" or "ambiguous" indication of her desire to remain silent. *Id.* For example, *See Jacobs v. Singletary,* 952 F.2d 1282 (11th Cir.1992) (invocation of right to silence where suspect answered all questions with "it doesn't matter"); *United States v. Pena,* 897 F.2d 1075, 1081 (11th Cir.1990) (invocation of right to silence when suspect said, "I want to. I really want to but, I can't. They will kill my parents."); *Anderson v. Smith,* 751 F.2d 96, 102 (2d Cir.1984) (after defendant gave brief confession, officer turned on videotape and said "Do you want to talk to me now?" and defendant said, "No." Held invocation of right to remain silent). *But see Bradley v. Meachum,* 918 F.2d 338 (2d Cir.1990) (no invocation of right to remain silent when suspect stated he did not want to discuss his involvement in the crime but immediately denied any connection to the robbery and proffered an explanation of his whereabouts), *cert. denied,* 501 U.S. 1221, 111 S.Ct. 2835, 115 L.Ed.2d 1004 (1991); *United States v. Thompson,* 866 F.2d 268, 271 (8th Cir.) (no invocation of right to remain silent where suspect said "I'll wait a little while before I'm interviewed"), *cert. denied,* 493 U.S. 828, 110 S.Ct. 94, 107 L.Ed.2d 59 (1989); *United States v. Joyner,* 539 F.2d 1162, 1165 (8th Cir.) (no invocation of right to remain silent when suspect stated that he had the tractor stored in the Gary, Indiana, area and that it was accruing storage charges, but would not tell the FBI specifically where the tractor

was being kept), *cert. denied,* 429 U.S. 983, 97 S.Ct. 499, 50 L.Ed.2d 593 (1976).

▮▮▮ In this case, defendant was advised of her *Miranda* rights and responded by saying she understood her rights and had nothing to hide. She then proceeded to answer the agent's questions. I find that defendant did not invoke her right to remain silent. There is nothing equivocal or ambiguous about "I have nothing to hide." Her actions in willingly answering the questions posed to her immediately thereafter confirm that she had intended to be interviewed without counsel present when she stated that she understood her rights and had nothing to hide.

Therefore, because defendant adequately waived her *Miranda* rights prior to being questioned, her motion to suppress on this basis should be denied.

## VIII. IMPROPER DETENTION

Defendant next argues that her detention was improper and any statements given during her detention were tainted. Defendant does not explain or support with any legal authority this allegation. I believe that defendant's allegation deals with her unlawful arrest pursuant to the Missouri 20–hour hold law, which is dealt with in Section XI of this Report and Recommendation. Therefore, I will not speculate further on what defendant may have been challenging in raising this issue and will address the 20–hour hold issue below.

## IX. REQUEST FOR COUNSEL

▮▮▮ Defendant argues that her request for an attorney was not honored during her interrogation. In *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), the Supreme Court held that law enforcement officers must immediately cease questioning a suspect who has clearly asserted her right to have counsel present during custodial interrogation.

▮▮▮ The undisputed facts presented during the evidentiary hearing establish that defendant was questioned for more than an hour, then was asked if she would give a

written statement. At that point she refused, indicating that she would not give a written statement or sign anything without an attorney. This was the first time defendant mentioned an attorney during the interrogation, and at that point the questioning ceased.

Therefore, because the undisputed evidence establishes that defendant's request for an attorney was honored, her motion to suppress on this basis should be denied.

## X. HELD "INCOMMUNICADO"

Defendant argues that she was held "incommunicado" in violation of law for the purpose of coercing an incriminating statement from her. Defendant does not elaborate on this argument other than stating that law enforcement officials ignored defendant's repeated requests to consult with counsel. However, as stated above, there was absolutely no evidence presented that defendant requested an attorney until after she had given her entire oral statement. At that time all questioning ceased. The issue of defendant's incarceration for twelve hours prior to her being questioned is dealt with above.

Because defendant has not shown that she was unconstitutionally held "incommunicado," her motion to suppress on this basis should be denied.

## XI. MISSOURI'S 20–HOUR HOLD

Finally, defendant argues that her arrest was effectuated without probable cause for the sole purpose of coercing a statement from her and not for the purpose of initiating her prosecution. The issue of probable cause was addressed above in Section IV. However, the issue of whether the defendant's arrest—pursuant to the Missouri 20–hour hold law and admittedly solely for investigative purposes in an investigation run by a federal prosecutor—is another matter. I find that the arrest, detention and subsequent questioning, photographing and fingerprinting were unconstitutional for two reasons. First, I find that the arrest was pretextual, that is, defendant was arrested for the sole purpose of interrogating her and collecting evidence resulting in an unconstitutional arrest. Second, I find that defendant's detention violated Federal Rule of Criminal Procedure 5(a).

### A. PRETEXTUAL ARREST

▮ Evidence obtained by state officers during a search which, if conducted by federal officers, would have violated the defendant's immunity from unreasonable searches and seizures under the fourth amendment is inadmissible in a federal criminal trial. *Elkins v. United States,* 364 U.S. 206, 223, 80 S.Ct. 1437, 1447, 4 L.Ed.2d 1669 (1960). The test is one of federal law, "neither enlarged by what one state court may have countenanced, nor diminished by what another may have colorably suppressed." *Id.* at 224, 80 S.Ct. at 1447.

In this case, the government argues that defendant was lawfully arrested pursuant to the Missouri 20–hour hold law. This position was advanced unapologetically in both the pleadings and in the testimony of the government witnesses at both hearings mentioned above. The 20–hour hold law is found in Section 544.170 of the Missouri Revised Statutes which reads as follows:

All persons arrested and confined in any jail, calaboose or other place of confinement by any peace officer, without warrant or other process, for any alleged breach of the peace or other criminal offense, or on suspicion thereof, shall be discharged from said custody within twenty hours from the time of such arrest, unless they shall be charged with a criminal offense by the oath of some credible person, and be held by warrant to answer to such offense; and every such person shall, while so confined, be permitted at all reasonable hours during the day to consult with counsel or other persons in his behalf; and person or officer who shall violate the provisions of this section, by refusing to release any person who shall be entitled to such release, or by refusing to permit him to see and consult with counsel or other persons, or who shall transfer any such prisoner to the custody or control of another, or to another place, or prefer against such person a false charge, with intent to avoid the provisions of this section, shall be deemed guilty of a misdemeanor.

 As defendant correctly points out, this statute is not a "sword in the hands of the police," but rather "a shield for the citizen." The statute does not create an investigative tool for Missouri police officers; rather, it sets a limit on the amount of time the police may detain a suspect while determining whether there is enough evidence of a crime to present the suspect to a judge or prosecutor to begin criminal proceedings. Indeed, the Supreme Court in *United States v. Lefkowitz,* 285 U.S. 452, 52 S.Ct. 420, 76 L.Ed. 877 (1932), held that an arrest for the primary purpose of furthering an ulterior goal is unreasonable under the fourth amendment. In that case, the Court held that "[a]n arrest may not be used as a pretext to search for evidence." *Id.* at 467, 52 S.Ct. at 424. Therefore, any interpretation of Section 544.170 which includes authority for making investigative arrests would clearly be unconstitutional. Unfortunately, the Missouri police officers, and now the federal prosecutor's office, the United States Secret Service, the Internal Revenue Service, and the Bureau of Alcohol, Tobacco and Firearms have so interpreted this statute.

 The Supreme Court has never specifically decided the pretext issue. However, in *Horton v. California,* 496 U.S. 128, 138, 110 S.Ct. 2301, 2309, 110 L.Ed.2d 112 (1990), the Court stated that:

> The fact that an officer is interested in an item of evidence and fully expects to find it in the course of a search should not invalidate its seizure if the search is confined in area and duration by the terms of a warrant or a valid exception to the warrant requirement.

 This statement seems to indicate that the Court, if presented with the question, would adopt what has been termed the "absolute objective approach." That approach was adopted by the Eighth Circuit in *United States v. Cummins,* 920 F.2d 498, 501 n. 3 (8th Cir.1990), *cert. denied,* 502 U.S. 962, 112 S.Ct. 428, 116 L.Ed.2d 448 (1991), where the court stated:

> The officer's motive becomes relevant only after a determination is made that the

Fourth Amendment actually was violated. When this threshold issue is resolved in the affirmative, the officer's state of mind may be relevant in determining whether the exclusionary rule should be applied. *Scott v. United States,* 436 U.S. 128, 139 n. 13 [98 S.Ct. 1717, 1724 n. 13, 56 L.Ed.2d 168] (1984).

 Therefore, as articulated in *United States v. Cummins,* 920 F.2d at 501, the official test in the Eighth Circuit is "so long as the police are doing no more than they are legally permitted and objectively authorized to do, the resulting stop or arrest is constitutional." The first inquiry, then, becomes whether the police were doing no more than they were legally permitted and objectively authorized to do. I believe the facts indicate that clearly they were not.

 As stated above, in federal court whether a suspect's fourth amendment right has been violated is a question of federal law. *Elkins v. United States,* 364 U.S. at 223, 80 S.Ct. at 1447. It is undisputed that federal agents are not permitted to arrest suspects pursuant to Missouri's 20-hour hold law.[6] Although federal agents may make an arrest without a warrant provided they have probable cause to do so, Federal Rule of Criminal Procedure 5(a) requires that the arrestee be brought before a magistrate judge "without unnecessary delay". Therefore, under no circumstances would a federal agent be able to make a warrantless arrest, supported by probable cause, then hold the suspect for 20 hours while interrogating the suspect, taking her photograph, and obtaining her fingerprints all before releasing her "pending further investigation."

Thirty-six years ago, in *Abel v. United States,* 362 U.S. 217, 225, 80 S.Ct. 683, 690, 4 L.Ed.2d 668 (1960), the United States Supreme Court was asked whether the government used an INS administrative warrant for illegitimate purposes since the FBI was simultaneously interested in Abel for suspected espionage. There the defendant argued that it was not the government's true purpose in arresting him under the warrant to take him into custody pending a determina-

---

6. See 2Tr. at 165–166.

tion of his deportability. Rather the government's real aims, Abel argued, were to place him in custody so that pressure might be brought to bear upon him to confess his espionage and cooperate with the FBI and to permit the government to search through his belongings for evidence of his espionage to be used in a designed criminal prosecution against him. The Court stated:

Were this claim justified by the record, it would indeed reveal a serious misconduct by law-enforcing officers. The deliberate use by the Government of an administrative warrant for the purpose of gathering evidence in a criminal case must meet stern resistance by the courts. The preliminary stages of a criminal prosecution must be pursued in strict obedience to the safeguards and restrictions of the Constitution and laws of the United States.... [H]owever, ... on this record ... [t]he crucial facts were found against the petitioner.

*Id.* at 226, 80 S.Ct. at 690.

Thirteen years later, in *Gustafson v. Florida*, 414 U.S. 260, 94 S.Ct. 488, 38 L.Ed.2d 456 (1973), the defendant challenged the search of his person after a concededly valid custodial arrest for driving with a suspended license. Heroin was found during the ensuing search. Justice Powell, in a concurring opinion, noted that Gustafson would have presented a different question "if [he] could have proved that he was taken into custody only to afford a pretext for a search actually undertaken for collateral objectives." *Id.* at 238 n. 2, 94 S.Ct. at 494 n. 2.

The Ninth Circuit was presented squarely with the issue of the police engaging in a deliberate scheme to evade the requirements of the fourth amendment in *Taglavore v. United States*, 291 F.2d 262 (9th Cir.1961). In that case, Taglavore, who was a suspect in a marijuana investigation, was observed by a police officer failing to signal for a right turn and having faulty brake and signal lights. The officer did not stop Taglavore, but waited until the next day to obtain arrest warrants for those traffic violations. He then delivered the warrants to other inspectors and directed them to go out at once and find Taglavore, knowing that Taglavore at that time would likely have marijuana in his possession. The court, in reversing the conviction, held that:

The police engaged in a deliberate scheme to evade the requirements of the Fourth Amendment by using a traffic arrest warrant to search appellant for narcotics they suspected he had on his person.... This is not a case where some minor technicality has been overlooked in acquiring an arrest or search warrant or where a police officer confronted with a sudden and unexpected situation has made a miscalculation in acting; such cases present a far different situation. Here instead we have a deliberate, pre-planned attempt by the police to violate a suspect's constitutional rights by engaging in a subterfuge. "It is the duty of the courts to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments thereon." *Boyd v. United States*, 116 U.S. 616, 635, 6 S.Ct. 524, 535, 29 L.Ed. 746 (1886).

*Id.* at 267. Therefore, the court found that regardless of probable cause, the illegal activities of the police rendered the contested evidence inadmissible. *Id.*

Then in 1987, the Eighth Circuit Court of Appeals, in *Warren v. City of Lincoln, Nebraska*, 816 F.2d 1254, 1259 (8th Cir.1987), *cert. denied*, 490 U.S. 1091, 109 S.Ct. 2431, 104 L.Ed.2d 988 (1989), held that if a jury found by the evidence that Warren's arrest on a traffic warrant was "nothing more than a subterfuge or pretext executed to get Warren into police headquarters to be questioned about an unrelated matter, [that would be] unlawful."

In *Warren*, the suspect was found by police sitting in his car in the vicinity of a recent burglary. He was suspected of participating in that burglary and a string of sex-related burglaries. Warren was questioned, and an officer was informed after conducting a warrant check that Warren had an arrest warrant outstanding for speeding and failing to appear on the citation. Warren was arrested, patted down, and taken to the police station. He was interviewed there by a detective who was investigating the robberies, was fingerprinted, handprinted, and photographed. Two hours later he was

released after posting a $50 bond on the traffic charge.[7] The court held that "[o]n the basis of these facts, a jury could have concluded that Warren's arrest on the traffic warrant was *nothing more than a subterfuge or pretext executed to get Warren into police headquarters to be questioned about an unrelated matter and as such was unlawful.*" (emphasis added). The court further held that:

> Police are not permitted to hold someone in custody beyond the time necessary to process him with respect to the crime of arrest for the sole purpose of trying to connect that person to another crime. To do so is an unlawful seizure.

*Id.* at 1259. The court cited with approval excerpts from *Adams v. United States,* 399 F.2d 574 (D.C.Cir.1968), *cert. denied,* 393 U.S. 1067, 89 S.Ct. 722, 723, 21 L.Ed.2d 710 (1969), wherein the court held:

> Rule 5(a) provides that presentment without unnecessary delay shall be made on the charge for which they were arrested.... To continue their custody without presentment for the purpose of trying to connect them with other crimes *is to hold in custody for investigation only, and that is illegal;* its operative effect is essentially the same as a new arrest and, if not supported by probable cause, it is an illegal detention.

*Adams v. United States,* 399 F.2d at 577. Former Chief Justice, then Judge, Burger stated in his concurring opinion, also cited with approval by the Eighth Circuit in *Warren,* as follows:

> To my mind, the importance of the investigation of crimes other than that for which the original arrest was made is not that there may be something resembling a new "arrest," but that the period of "unnecessary delay" forbidden by Fed.R.Crim.P.

5(a) has then been reached. Necessary delay can reasonably relate to time to administratively process an accused with booking, fingerprinting and other steps and sometimes even to make some limited preliminary investigation into his connection with the crime for which he was arrested, especially when it is directed to possible exculpation of the one arrested. However, when delay of presentment to the magistrate is for the purpose of investigation of other crimes, then there is no doubt that the "delay" has become "unnecessary."

*Warren,* 816 F.2d at 1260, quoting *Adams v. United States,* 399 F.2d at 579.

In *United States v. Johnson,* 994 F.2d 740 (10th Cir.1993), state and federal agents, following a federal lead, visited the defendant's taxidermy shop, allegedly in order to interview him and inspect the shop. The defendant was out of the country. The agents showed an employee a statute that authorized a state inspection, and three state agents and one federal agent began to search the premises. The agents discovered specimens of federally protected migratory birds resulting in the subsequent indictment. Upon challenge that the search was pretextual, the court held:

> [T]he administrative search was employed solely as an instrument of criminal law enforcement. The uncontroverted facts establish that the federal agent used the state inspection as a pretext for a broad investigatory search. We have not been cited to any federal statute that authorizes a warrantless inspection of taxidermists. A Wyoming statute authorizes inspections of taxidermists, *but only when performed by state agents.*

---

7. Warren sued the police department under § 1983. The issue addressed by the Eighth Circuit was whether the trial court's due process of law instruction was correct. That instruction stated that Warren was arrested for speeding and failing to appear in court in connection with the charge of speeding and that the officers could properly detain Warren beyond the time necessary to process him with respect to that offense if they had reasonable grounds to believe that such action was necessary in order to carry out legiti-

mate investigative functions. The Eighth Circuit held that the instruction should have provided the jury the opportunity to make the determination whether Warren was arrested on the traffic offense or whether the arrest was pretextual since "[o]n the basis of these facts, a jury could have concluded that Warren's arrest on the traffic warrant was nothing more than a subterfuge or pretext executed to get Warren into police headquarters to be questioned about an unrelated matter and as such was unlawful."

*Id.* at 743 (emphasis added). The court found that the federal agent's active participation in the search transformed the state inspection into a federal investigatory search. *Id.* The court further held that:

On this record, such a course appears objectively unreasonable.... Because the evidence uniformly establishes that the federal agent initiated this operation for federal law enforcement purposes, ... we conclude that the warrantless search was unreasonable. The presence and active participation of the federal agent during the search of Mr. Johnson's shop, and the federal agent's insistence that the state agent accompany him establish as a matter of law that the federal agent used the state regulatory inspection as a pretext for an investigatory search. *Federal agents may not cloak themselves with the authority granted by state inspection statutes in order to seek evidence of criminal activity and avoid the Fourth Amendment's warrant requirement.*

*Id.* at 743–44 (emphasis added).

On facts similar to those discussed above, courts around the country have consistently warned that this kind of abuse will not be tolerated in courts. *See United States v. Trigg,* 878 F.2d 1037, 1043 (7th Cir.1989) ("Law enforcement authorities who stockpile arrest warrants for traffic offenses or non-payment of library fines in order to have a 'ready-reserve' when arrest (or harassment) of a particular citizen is desired deserve no protection in the name of judicial restraint."), *cert. denied,* 502 U.S. 962, 112 S.Ct. 428, 116 L.Ed.2d 448 (1991); *Taglavore v. United States,* 291 F.2d at 266 ("Were the use of misdemeanor arrest warrants as a pretext for searching people suspected of felonies to be permitted, a mockery could be made of the Fourth Amendment and its guarantees. The courts must be vigilant to detect and prevent such a misuse of legal processes.").

Obviously, none of these cases is identical to the situation here. However, the universal principal in each case is that evidence obtained by intentionally circumventing procedures which are in place to protect constitutional rights shall be suppressed, and the concerns expressed in each case lend support to the conclusion that the arrest and detention in this case was unconstitutional.

In *Abel v. United States,* 362 U.S. 217, 80 S.Ct. 683, 4 L.Ed.2d 668 (1960), the Supreme Court expressed its opinion that using an administrative warrant to interrogate a suspect for a criminal investigation would reveal "serious misconduct" by the police and must "meet stern resistance by the courts." Justice Powell reiterated this concern in his concurring opinion in *Gustafson v. Florida,* 414 U.S. 218, 94 S.Ct. 494, 38 L.Ed.2d 427 (1973). Here the government used a Missouri statute which criminalizes police conduct as a federal investigative tool, circumventing the requirements of obtaining an arrest warrant and presenting the suspects to a judge for commencement of criminal charges. As stated in *Abel,* this is "serious misconduct" which must "meet stern resistance by the courts."

The Ninth Circuit reversed a conviction after the police engaged in a deliberate scheme to evade the requirements of the fourth amendment by purposely obtaining and executing a warrant for a traffic violation at a time when the suspect was likely to be possessing marijuana. *Taglavore v. United States,* 291 F.2d 262 (9th Cir.1961). Here, the police obtained a federal search warrant from Chief U.S. Magistrate Judge John Maughmer the day before the search was to be conducted and the suspects arrested. The information in the search warrant affidavit clearly established probable cause to arrest defendant; however, the government intentionally refrained from requesting an arrest warrant opting instead to execute the preplanned scheme of arresting defendant pursuant to a Missouri pick-up order. In that way, the government engaged in a deliberate scheme to evade the requirements of an arrest warrant, issued by a neutral judge, and Rule 5(a) requiring prompt presentation before a judge.

As in *Warren v. City of Lincoln, Nebraska,* 816 F.2d 1254 (8th Cir.1987), *cert. denied,* 490 U.S. 1091, 109 S.Ct. 2431, 104 L.Ed.2d 988 (1989), the defendant's arrest in this case was nothing more than a subterfuge or pretext executed to get her into police headquar-

ters to be interrogated, photographed, and fingerprinted.

Similarly, as stated in *Adams v. United States*, 399 F.2d 574 (D.C.Cir.1968), *cert. denied*, 393 U.S. 1067, 89 S.Ct. 722, 723, 21 L.Ed.2d 710 (1969), any time of detention past that required for processing the defendant on the crime for which she was arrested—for an investigative purpose—is unlawful.

Finally, I find that the facts in *United States v. Johnson*, 994 F.2d 740 (10th Cir. 1993), are extremely similar to those in this case, and that the legal reasoning parallels that followed in the Eighth Circuit. In that case, the federal government used a statute available only to state officers to effectuate a federal criminal investigation. In this case, the federal government also used a statute available only to state officers to advance a federal criminal investigation. Worse, in *Johnson* the court stated that the government, which had the burden of proof, offered no evidence as to why the federal agent wanted the state agent to participate in this investigation. In this case, the federal agents openly admitted that the state officers were necessary to utilize the Missouri 20–hour hold statute as federal agents clearly could not effectuate such an arrest. Under the above-cited case law, clearly the agents in this case may not rely on the state officers effecting an arrest pursuant to a Missouri pick-up order where their sole purpose is to conduct a federal criminal investigation.

Based on all of the above authority, I can reach no other conclusion than that the intentional circumvention of the requirements of Rule 5(a) and the requirement that a neutral judge issue an arrest warrant, for the purpose of interrogating, photographing and fingerprinting a suspect amounts to a violation of the fourth amendment.

Because a determination has been made that the fourth amendment was actually violated, the officers' state of mind becomes relevant in determining whether the exclusionary rule should be applied. Obviously, the fact that everyone involved—from the prosecutor to the case agent to the assisting detectives all the way down to the arresting officers—knew that defendant would not be charged on that occasion and that the sole purpose of the arrest was for investigation, illegal under *United States v. Lefkowitz*, 285 U.S. 452, 52 S.Ct. 420, 76 L.Ed. 877 (1932), commands that the evidence subsequently obtained be suppressed. This obviously includes the statement, the photographs and fingerprints obtained on the day of defendant's arrest. But it should also include, pursuant to the fruits doctrine, all information and evidence obtained as a result of the unlawfully seized statement, photographs and fingerprints. As that evidence was not presented to me during the suppression hearings, exactly what that encompasses cannot be determined at this time.

Because I find that the arrest of defendant pursuant to the Missouri 20–hour hold law was an unlawful pretext for investigative purposes, and that the government intentionally circumvented procedures in place to protect defendant's constitutional rights, the evidence outlined above should be suppressed.

### B. RULE 5(a)

Federal Rule of Criminal Procedure 5(a) states that "any person making an arrest without a warrant shall take the arrested person without unnecessary delay before the nearest available federal magistrate judge". Where the requirements of Rule 5(a) are not met, any resulting confession must be suppressed. *Mallory v. United States*, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957). In this case, there is no question that the defendant was not presented, at any time, before any judge. Rather, defendant was arrested pursuant to a Missouri pick-up order, held for twelve hours, interrogated, and subsequently released.

■ In applying Rule 5(a), ordinarily the relevant delay is measured from the commencement of federal detention. *United States v. Woods*, 613 F.2d 629, 633 (6th Cir.), *cert. denied*, 446 U.S. 920, 100 S.Ct. 1856, 64 L.Ed.2d 275 (1980). However, when there is a working arrangement between state police and federal agents for the purpose of aiding and abetting the federal officers in carrying on interrogation of the suspect in violation of Federal Rule 5(a) requiring prompt presentment before a judge, the delay is measured

from the time of detention. *United States v. Woods,* 613 F.2d at 633.

■ In this case, it is not really important when the delay measurement should begin since there is obviously no ending point—defendant was *never* presented before a judge. However, I find that there is proof of a "working relationship" which would begin the clock at the time of detention. The federal government (the agents and the prosecutor) agreed to instruct a state officer to issue a pick-up order for defendant. In addition, it was common knowledge that defendant had been arrested, as the plan was to either arrest her in her home during the search or arrest her pursuant to the pick-up order if she left before the search. Yet she was held for twelve hours before the federal agent arrived to begin the interrogation—which occurred prior to presentment before a judge. Had the federal involvement begun at the point when Agent Gasvoda arrived to conduct the interrogation, he should have taken custody of the defendant and presented her before a federal magistrate judge, not conducted an interrogation in a county police station with no prior judicial involvement.[8]

This issue is similar to that presented in knock and announce cases. Under § 3109, a search conducted with the involvement of just one federal officer must comply with federal law. *United States v. Schenk,* 983 F.2d 876, 879 n. 5 (8th Cir.1993); *United States v. Moore,* 956 F.2d 843, 847 (8th Cir. 1992).

I find that Rule 5(a) applies to this case because of the working arrangement between the state police and federal agents, and that the requirements of Rule 5(a) were not met. Therefore, defendant's motion to suppress on this basis should be granted.

## XII. CONCLUSION

Based on the above-stated findings of fact and the law as discussed in sections III through XI, I make the following proposed conclusions of law:

1. Because this was not purported to be an investigative stop, the dictates of *Terry v. Ohio* are inapplicable.

2. All of the information known by police at the time of defendant's arrest establishes probable cause that she was promoting prostitution.

3. There is no evidence in this record that defendant's statement was coerced.

---

8. There should be no doubt that the arrest, detention, interrogation, fingerprinting and photographing of this defendant were done pursuant to a working relationship with the federal government. This investigation was headed solely by the federal prosecutor's office. There is no question that no other prosecutor's office was involved at any time. The federal prosecutor had numerous meetings with the federal agents and state law enforcement officers during the pendency of the investigation. In fact, this case had federal strings woven throughout the entire investigative fabric: (1) The United States Secret Service monitored federally-authorized pen registers and trap and trace devices. The information derived from those pen registers and trap and trace devices included the fact that phone calls to several companies were all call forwarded to defendant's telephone number, the volume of calls coming into or going out of defendant's telephone number, the identity of the women allegedly working for defendant since their phone numbers were obtained, and the fact that an act of prostitution had probably been "ordered" which allowed the police to follow women to the hotels and later conduct "knock and talks" with the clients. (2) Federal grand jury subpoenas were used to obtain copies of checks written on the account of MCC Remodeling, which resulted in the agents learning that checks were written to women suspected of working as prostitutes, and apparently formed the basis for the federal forfeiture count in the indictment. (3) A federal search warrant authorized the search of defendant's residence. (4) A temporary and a 90-day temporary restraining order were issued by two separate federal district court judges to seize real estate and personal property including bank accounts. (5) At the time of defendant's arrest, her car was towed to a special tow lot in anticipation of forfeiture pursuant to the federal forfeiture statute. (6) A special agent with the United States Secret Service conducted the interrogation of defendant, who was not presented with a *Miranda* waiver form in accordance with the policy of the U.S. Secret Service and in contradiction to the policy of the Kansas City, Missouri Police Department. (7) Federal grand jury subpoenas were obtained for suspects residing in Kansas in the event they could not be arrested in Missouri pursuant to the pick-up orders. (8) Not one of the suspects in this case was ever charged in State court, and as mentioned above, the only prosecutor's office involved in the investigation and charging of these defendants was the United States Attorney's Office.

4. Because defendant was advised of her *Miranda* rights before she was questioned, the rights were timely given.

5. Because there is nothing equivocal or ambiguous about "I have nothing to hide," and because defendant's actions in willingly answering the questions posed to her immediately after making that statement, defendant sufficiently waived her right to remain silent.

6. Because all questioning ceased at the time defendant requested an attorney, her right to counsel was not violated.

7. Defendant has not shown that she was unconstitutionally held "incommunicado."

8. The arrest of defendant pursuant to the Missouri 20–hour hold law was an unlawful pretext for investigative purposes, and the government intentionally circumvented procedures in place to protect defendant's constitutional rights.

9. Rule 5(a) applies to this case because of the working arrangement between the state police and federal agents, and the requirements of Rule 5(a) were not met since defendant was never presented before a judge.

Therefore, it is

RECOMMENDED that the court, after making an independent review of the record and the applicable law, enter an order granting defendant's motion to suppress evidence.

Counsel are advised that, pursuant to 28 U.S.C. § 636(b)(1), each has ten days from the date of receipt of a copy of this report and recommendation to file and serve specific objections unless an extension of time· for good cause is obtained.